Opinion
 

 ARMSTRONG, J.
 

 In this case, we consider the scope of collapse coverage in a property insurance policy, an issue which has long been the subject of litigation in other states. The insurance policy before us covered “loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building” resulting from specified
 
 *402
 
 causes. We reject the position of a number of states, that such a clause covers only “actual collapse,” and agree with those states, and the trial court here, which find that such a clause covers actual or imminent collapse.
 

 Factual and Procedural
 
 Summary
 
 [1]
 

 Doheny West Homeowners’ Association (Doheny West) is the homeowners association of a 151-unit condominium complex in West Hollywood. The complex has three levels of enclosed parking, topped with a deck, pool, hot tub, and pool room. Doheny West purchased an insurance policy for the complex from respondent American Guarantee & Liability Insurance Group and Zurich-American Insurance Group
 
 [2]
 
 (American Guarantee). The policy, titled a “Commercial Package Policy,” included property insurance. A section entitled “Causes of Loss—Special Form” listed a number of exclusions and some additional coverages. Among the exclusions were loss or damage caused by or resulting from “wear and tear”; “rust, . . . deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself’; “settling, cracking, shrinking or expansion”; “continuous or repeated seepage or leakage of water that occurs over a period of 14 days or more”; and inadequate or defective maintenance, materials, design, workmanship, and construction.
 

 The policy also excluded coverage for collapse, except as provided in the provision entitled “Additional Coverage for Collapse.” That additional coverage provided, “We will pay for loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building or any part of a building caused only by one or more of the following: 1. The ‘specified causes of loss’ ... all only as insured against in this Coverage Part; 2. Hidden decay; . . .” The policy defined “specified causes of loss” to include water damage, and defines “water damage” to mean “accidental discharge or leakage of water ... as the direct result of the breaking or cracking of any part of a system or appliance containing water . . . .” The policy also provided that “collapse does not include settling, cracking, shrinkage, bulging or expansion.”
 

 In July of 1992, Doheny West hired a structural engineer, David Taubman, to inspect the pool and parking structure. Taubman observed substantial spalling and cracking of the girders, columns, and wall surfaces in the
 
 *403
 
 parking structure, especially in the area around the pool vault. In a July 25, 1992, letter to the board of directors, he reported that “After inspecting the above referenced swimming pool on July 22, 1992 and reviewing the building plans, I am strongly recommending that the pool be emptied of water as soon as possible. The damage is extensive and an earthquake of large magnitude could cause a complete collapse of the pool.”
 

 Doheny West drained the pool, repaired the pool and parking structure, and tendered the claim to American Guarantee. On July 29, 1993, after receiving a report from its adjusters, American Guarantee denied the claim.
 

 Doheny West brought this lawsuit for breach of contract and bad faith, contending, inter alia, that the loss was covered under the additional coverage for collapse. Court trial was held on the breach of contract cause of action. Prior to trial, the court ruled on the contract interpretation issues. In the ruling challenged on this appeal, the court held that the “Additional Coverage for Collapse” covered actual or imminent collapse.
 

 At trial, Doheny West presented expert testimony that the structure was in a state of imminent collapse. American Guarantee presented expert opinions to the contrary. The court found that Doheny West had not met its burden of proving that any part of the building was in a state of imminent collapse, and entered judgment for American Guarantee.
 

 Discussion
 

 The sole legal issue on this appeal concerns the trial court’s interpretation of the collapse coverage. Both Doheny West and American Guarantee contend that the court erred in finding that the policy covered actual or imminent collapse, although they urge different coverage interpretations, with American Guarantee arguing that “collapse” means “actual collapse,” and Doheny West contending that the policy covers substantial impairment of the structural integrity of a building. We find that the trial court’s ruling was correct.
 

 As both parties point out, the word “collapse,” as used in insurance policies, has been considered by many courts throughout the country, for many years. One commentator has noted that “the collapse peril first appeared in property insurance policies in 1954. It is perhaps an understatement to say that it has ‘spawned much litigation’ since that time.” (1 Cozen, Insuring Real Property (1997) §2.02[3], p. 2-25; see also Annot., What Constitutes “Collapse” of a Building Within Coverage of Property Insurance Policy (1976) 71 A.L.R.3d 1072.)
 

 
 *404
 
 The case law falls into two general categories, with some courts adopting what we may for convenience’s sake term a narrow definition of “collapse,” and some adopting a broader one. Courts that adopt the narrow definition generally hold that the word “collapse” is unambiguous,
 
 [3]
 
 and that a building or part thereof has not collapsed unless it has fallen down or caved in. “The word ‘collapse’ is not one of art, but is unambiguous and is generally understood to have the meaning of to fall or shrink together, to cave in, to fall into a flattened, distorted or disorganized state.”
 
 (Employers Mut. Cas. Co. of Des Moines, Iowa
 
 v.
 
 Nelson
 
 (Tex. 1962) 361 S.W.2d 704, 708 [Texas law].) According to those courts, “. . . the word connotes a complete change in a structure, where the building loses its distinctive character as a building”
 
 (Higgins
 
 v.
 
 Connecticut Fire Insurance Company
 
 (1967) 163 Colo. 292 [430 P.2d 479, 480] [Colorado law]) or “a flattening or breaking down because of a loss of [the building’s] structural rigidity or by falling into or against itself.”
 
 (Sherman
 
 v.
 
 Safeco Ins. Co. of America
 
 (Colo.Ct.App. 1983) 670 P.2d 16, 17 [Colorado law].)
 

 American Guarantee asks us to adopt this rule. We cannot, however, interpret this policy to mean that there is coverage only if a building falls, and to exclude coverage for collapse which is inevitable but which has not yet taken place. First, as Doheny West argues, and many of the “broad definition” cases have pointed out, such an interpretation would require an insured seeking the benefits of its insurance coverage to neglect repairs and allow a building to fall, a course of action which could not possibly comport with the expectation and intent of the insured, or advance the best interests of the insured, the public, or even the insurer, if the actual collapse took place at a time which brought it under the insurer’s coverage. As one court has said, such a construction “would be unreasonable, to say the least.”
 
 (Royal Indem. Co.
 
 v.
 
 Grunberg
 
 (1990) 155 A.D.2d 187, 189-190 [553 N.Y.S.2d 527, 529] [New York law]; see also
 
 Beach
 
 v.
 
 Middlesex Mut. Assur. Co.
 
 (1987) 205 Conn. 246 [532 A.2d 1297, 1300] [Connecticut law].)
 

 Such an interpretation would also be inconsistent with the policy language. In many of the cases cited to us, the policy covers “collapse of
 
 *405
 
 buildings.” (See
 
 Higgins
 
 v.
 
 Connecticut Fire Insurance Company, supra,
 
 430 P.2d 479] [Colorado law];
 
 Sherman
 
 v.
 
 Safeco Ins. Co. of America, supra,
 
 670 P.2d 16, 17 [Colorado law].) Here, in contrast, the policy covers “loss or damage caused by or resulting from risks of direct physical loss involving collapse of a building.”
 

 Under California law, our task is to construe not merely a single word, “collapse,” but the entire coverage clause.
 
 (Bank of the West
 
 v.
 
 Superior Court
 
 (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) That clause cannot be said to be clear, explicit, and unambiguous, and thus must be interpreted to protect the objectively reasonable expectations of the insured.
 
 (Id.
 
 at pp. 1264-1265.) We examine the clause with those rules in mind.
 

 It is undisputed that the clause covers “collapse of a building,” that is, that there is coverage if a building falls down or caves in. However, the clause does not limit itself to “collapse of a building,” but covers “risk of loss,” that is, the threat
 
 [4]
 
 of loss. Further, on its terms it covers not only loss resulting from an actual collapse, but loss “involving” collapse. Thus, with the phrases “risk of loss,” and “involving collapse,” the policy broadens coverage beyond actual collapse.
 

 We do not, however, agree with Doheny West that those words broaden coverage to the extent that the clause covers “substantial impairment of structural integrity.” First, we do not believe that an insured purchasing a coverage entitled “Additional Coverage for Collapse,” would reasonably expect the policy to cover mere impairment of structural integrity. Further, the language of the policy when considered as whole does not support such an interpretation. This is so because the policy provides that “collapse does not include settling, cracking, shrinkage, bulging or expansion,” and specifically excludes coverage for such things as damage caused by seepage of
 
 *406
 
 water, wear and tear, decay, deterioration, or faulty maintenance, unless it is covered under the additional collapse coverage, that is, unless there is also damage caused by “risk of direct physical loss involving collapse of building.”
 

 Thus, under the terms of the policy, the damage must be such that it will lead to collapse. Further, since any of the excluded causes could result in collapse if the initial damage was neglected for a long enough period, an additional limitation is logically necessary if we are to avoid converting this insurance policy into a maintenance agreement, “contrary to the fundamental rule of construing insurance policies which requires that ‘ “[contracts of insurance ... be viewed in the light of their general objects and purposes, . . . [Citation.]” ’ [Citation.]”
 
 (Murray
 
 v.
 
 State Farm Fire and Casualty Co.
 
 (1990) 219 Cal.App.3d 58, 62 [268 Cal.Rptr. 33].)
 

 We believe that the trial court correctly resolved this problem by requiring that collapse be actual or imminent.
 
 [5]
 
 “Imminent” means “likely to happen without delay; impending, threatening” (Webster’s New World Diet.,
 
 supra)
 
 or “likely to occur at any moment, impending.” (The Random House College Diet.,
 
 supra.)
 
 This construction of the policy avoids both the absurdity of requiring an insured to wait for a seriously damaged building to fall and the improper extension of coverage beyond the terms of the policy, and is consistent with the policy language and the reasonable expectations of the insured. This broader interpretation has been said to be the view of the majority of modem courts
 
 (American Concept Ins. Co.
 
 v.
 
 Jones
 
 (D.Utah 1996) 935 F.Supp. 1220, 1226) and that it “more realistically reflects the purposes of the policy.”
 
 (Nationwide Mut. Fire Ins. Co.
 
 v.
 
 Tomlin
 
 (1986) 181 Ga.App. 413 [352 S.E.2d 612, 615] [Georgia law].)
 

 Doheny West argues that the out-of-state cases that reject the “actual collapse” standard, as we do, interpret “collapse” to mean “substantial impairment of structural integrity.” We do not agree. Those cases do not extend coverage to impairment of structural integrity, even if the impairment is substantial, if it is unrelated to actual collapse. Instead, those cases either implicitly or explicitly require that collapse be imminent and inevitable, or all but inevitable. For example, in
 
 Thornewell
 
 v.
 
 Indiana Lumbermens Mutual Ins. Co.
 
 (1967) 33 Wis.2d 344 [147 N.W.2d 317], the Supreme Court of
 
 *407
 
 Wisconsin considered a policy which, like this one, covered collapse of a part of a building. That court found that “If the condition of the part of the building claimed to be in a state of collapse is such that the basic structure or substantial integrity of the part is materially impaired so that it cannot perform its structural function as a part of the building and is in immediate danger of disintegrating, then it can be said to be in a state of collapse within the meaning of the extended coverage of the policy.”
 
 (Id.
 
 at 147 N.W.2d at p. 320.) In
 
 Thornewell,
 
 two basement walls of the insured building had bulged inward, but there was no evidence that they were in immediate danger of falling, and the ruling, at trial and on appeal, was that there was no covered collapse.
 

 Whispering Creek
 
 v.
 
 Alaska Nat. Ins. Co.
 
 (Alaska 1989) 774 P.2d 176 (Alaska law) interpreted a coverage clause identical to the one before us here. There, the roof of the building had deteriorated to the point where local authorities had determined that it was not capable of supporting a water or snow load. The appellate court found undisputed evidence that the building “was in a life-threatening condition and in imminent danger of collapse,” and concluded that “the damage producing this less than total collapse” was covered.
 
 (Id.
 
 at p. 180.)
 

 Doheny West cites
 
 Royal Indem. Co.
 
 v.
 
 Grunberg, supra,
 
 155 A.D.2d 187 [553 N.Y.S.2d 527] and
 
 John Abridge Co.
 
 v.
 
 Travelers Companies
 
 (D.D.C. 1995) 876 F.Supp. 1 for its proposed “substantial impairment” definition. We do not find that those cases support the position. In
 
 Royal Indem. Co.
 
 v.
 
 Grunberg,
 
 the court found coverage on a record which included uncontradicted evidence that the house was “in imminent danger of caving in,” and that if the insured had failed to make repairs, in violation of a duty to repair found in the policy, the building would have fallen.
 
 (Royal Indem. Co.
 
 v.
 
 Grunberg, supra,
 
 at p. 189 [553 N.Y.S.2d at p. 529].) In
 
 John Abridge Co.,
 
 where the evidence did not establish the degree of damage, the court refused to grant summary judgment on coverage questions to either party. (876 F.Supp. at p. 2.)
 

 Many other cases that find coverage under a broad definition, but do not use the term “imminent,” are decided on facts that indicate imminent danger and a degree of damage that indicates that the building will not stand. (See
 
 Beach
 
 v.
 
 Middlesex Mut. Assur. Co., supra,
 
 532 A.2d at pp. 1300-1301 [“substantial impairment” included a nine-inch-wide crack in a foundation wall and separation of the foundation wall from the building wall, separation of the support beams on top of the foundation, and a fallen concrete floor on a patio adjacent to the house];
 
 Auto Owners Ins. Co.
 
 v.
 
 Allen, supra,
 
 362 So.
 
 *408
 
 2d 176 [Florida law; undisputed expert declaration was that one exterior wall had collapsed, a second wall was leaning out a significant distance, and there was imminent danger that the building would fall further];
 
 Ercolani
 
 v.
 
 Excelsior Ins. Co.
 
 (3d Cir. 1987) 830 F.2d 31 [New Jersey law; exterior wall suddenly bulged inward due to termite damage and pressure of frozen groundwater so that it was not capable of supporting the house];
 
 Government Employees Insurance Co.
 
 v.
 
 DeJames
 
 (1970) 256 Md. 717 [261 A.2d 747] [Maryland law; wall had suddenly failed and would have collapsed but for wooden supports];
 
 Anderson
 
 v.
 
 Indiana Lumbermens Mutual Ins. Co.
 
 (La.Ct.App. 1961) 127 So.2d 304 [Louisiana law; cracks in the wall at every window and door; concrete slab which formed the base of the house was broken, cracked, and fallen; walls had cracks and separations from the slab to the roof line].)
 

 Our holding, that the policy before us covers loss or damage caused by imminent or actual collapse, is consistent with the only California case to have considered the meaning of “collapse” for insurance purposes,
 
 Sabella
 
 v.
 
 Wisler
 
 (1963) 59 Cal.2d 21 [27 Cal.Rptr. 689, 377 P.2d 889]. There, the insurance policy covered all physical loss except loss caused by settling, cracking, or shrinking, “ ‘unless loss by . . . collapse of buildings ensues.’ ”
 
 (Id.
 
 at p. 26.) The insured’s home was built on improperly compacted fill. The court found that the resulting damage was excluded as “settlement,” and held that “Furthermore ... the insurance contract excluded with sufficient clarity all loss by settling, whether gradual or rapid, unless collapse of the dwelling ensued, and since the house remained usable and continued to be occupied, it cannot be said that any ‘collapse’ occurred. Thus the case at bar is not a proper one for application of the rule advanced by plaintiffs that ‘ “[provisos and exceptions must be strictly construed against the insurer . . . , and in case it fails to do so, any ambiguity or reasonable doubt must be resolved in favor of the assured.” ’ ”
 
 (Id.
 
 at p. 31.)
 

 American Guarantee argues that
 
 Sabella
 
 holds that “collapse” is unambiguous and means actual collapse, and that the case compels such a finding here. However, as we have seen, we must construe the word in the context of the policy before us, which is not the same as the policy construed in
 
 Sabella.
 
 Further, in
 
 Sabella
 
 the Supreme Court did not find that “collapse” means actual collapse. Instead, the Court found that on the facts before it, the only damage was settling, which was excluded, and that the policy requirement that collapse ensue had not been met, since the house continued to be usable and occupied. (59 Cal.2d at p. 31.) We note, too, that the habitability standard applied by the Court is one sometimes cited by courts that apply a broad meaning to “collapse.” (See, e.g.,
 
 Anderson
 
 v.
 
 Indiana Lumbermens Mutual Ins. Co., supra,
 
 127 So.2d 304, 307 [Louisiana law].)
 

 
 *409
 
 Thus, the trial court correctly interpreted the policy. Further, ample evidence supports the trial court’s factual finding that there was no actual or imminent collapse of the Doheny West parking structure. Doheny West presented three witnesses who described the damage to the building and opined that the damage would lead to collapse. Taubman testified that at his initial observation, he believed that the pool had to be emptied of water, because it was in an “imminent collapse situation,” and that if the water were to remain in the pool, forces on the walls and the bottom of the pool “could have caused a collapse of the pool.” Further observations, including observations after demolition had begun, convinced him that removing the water was not only a necessity, but may have prevented a collapse. Taubman estimated that the load capacity of the pool structure had been reduced by as much as 50 percent. Raymond Itaya, a structural engineer who consulted with Taubman on repair specifications, testified that the structure was in danger of imminent collapse, in that there was a possibility of sudden shear failure. Douglas Ferrell, a civil engineer who designed the new pool and drainage system, testified that if the pool had not been drained and repairs made, there would have been a failure of the beams and columns which held the pool vault in place. He would not have been surprised if, under those circumstances, the structure had collapsed.
 

 American Guarantee presented contrary opinions in the testimony of two structural engineers, Donald Kay and Gary C. Hart. Kay observed the structure both prior to and during the repairs. He observed the damage to the beams and columns described by Doheny West’s witnesses, but believed that the structure was in no danger of collapse and saw nothing that would indicate that the structure was in a state of imminent collapse.
 

 Hart testified from pictures, plans, depositions, and other documents. He calculated the load capacity of the swimming pool supports and the load demand of the pool and deck and determined that the structure would not collapse even if the pool vault structure and supporting columns and beams lost 50 percent of capacity due to deterioration or water damage, or if the main support beam were completely eaten away by rust. This was true both because the structure overall had a high safety factor, and because the complex system of supports meant that the load could be shared by all the beams and columns. Hart testified that the building posed no danger of collapse, had not suffered any significant structural impairment, and that despite the damage, the beams and other supports were capable of supporting the building.
 

 Thus, the parties presented conflicting evidence on the degree of damage sustained by this building. The trial court, as trier of fact, accepted American
 
 *410
 
 Guarantee’s evidence that despite the damage, collapse was not imminent. Substantial evidence supported that finding.
 

 Disposition
 

 The judgment is affirmed.
 

 Grignon, Acting P. J., and Godoy Perez, J., concurred.
 

 Appellant’s petition for review by the Supreme Court was denied March 25, 1998.
 

 [1]
 

 American Guarantee’s request that we take judicial notice of Doheny West’s trial brief in this matter is granted.
 

 [2]
 

 In the trial court, the status of the Zurich-American Insurance Group as a business entity was unclear, and the parties agreed that American Guarantee was the real entity before the court. We include Zurich-American in this opinion because it was a named defendant in the lawsuit, and do not intend any comment on the legal status of any such entity.
 

 [3]
 

 Oddly, many of the cases that adopt a broad definition also find the word unambiguous, at least as used in the policy. (See, e.g.,
 
 Auto Owners Ins. Co.
 
 v.
 
 Allen
 
 (Fla.Dist.Ct.App. 1978) 362 So.2d 176, 177 [Florida law].) The classic reference, Couch on Insurance, finds that the word is unambiguous and that “. . . it is not necessary that the walls or other parts of the building actually fall down or together into an irregular mass or flat form within the abstract dictionary definition of collapse. ... [A] collapse is a sinking, bulging, breaking, or pulling away of the foundation or walls or other supports so as to materially impair their function and render them unfit for habitation. [SD The question of what constitutes collapse is largely one of degree, . . .” (13A Couch on Insurance (2d ed. 1982) § 48:179, pp. 184-185, fns. omitted.)
 

 [4]
 

 We must reject American Guarantee’s argument that “risk” means “perils” or causes of loss, although the word can have that technical meaning. (See Cal. Insurance Law & Practice (1997) § 35.04[1], p. 35-11; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 1995) '¡[6:275, p. 6B-20 [“The ‘perils’ or ‘risks’ insured against refer to ‘fortuitous, active, physical forces . . . which bring about the loss.’ ”].) When a word is used by the parties in a technical sense, or a special meaning is given to a word by usage, we apply that meaning.
 
 (AIU Ins. Co.
 
 v.
 
 Superior Court
 
 (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) However, there is no indication here that the parties used the word in a technical sense. “Risk” is commonly defined to mean “the chance of injury, damage, or loss; dangerous chance; hazard” (Webster’s New World Diet. (3d college ed. 1991).) or “exposure to the chance of injury or loss; a hazard or dangerous condition.” (The Random House College Diet. (rev. ed. 1975).) Even if American Guarantee commonly used the word for another, technical, meaning, nothing in the policy so informed Doheny West.
 

 [5]
 

 American Guarantee also argues that suddenness is also part of the definition of collapse. Although some courts have cited dictionary definitions that include that factor (see, e.g.,
 
 Niagara Fire Insurance Company
 
 v.
 
 Curtsinger
 
 (Ky. 1962) 361 S.W.2d 762, 763 [Kentucky law]), we do not believe that the ordinary use of the word as a noun includes suddenness, or that an ordinary insured would have understood the policy to limit coverage in that way.
 
 (Bank of the West
 
 v.
 
 Superior Court, supra,
 
 2 Cal.4th at pp. 1264-1265.)