

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-6-2004

# Buczek v. Cont Cslty Ins Co

Precedential or Non-Precedential: Precedential

Docket No. 02-2847

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Buczek v. Cont Cslty Ins Co" (2004). *2004 Decisions.* Paper 377.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/377

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT


Nos. 02-2847, 02-4063
_____


JACK BUCZEK; MARIE BUCZEK;
MICHAEL NEILL; SANDY NEILL,
an Unincorporated Association
t/a MEADOWS CONDOMINIUM
ASSOCIATION;
MEADOWS CONDOMINIUM
ASSOCIATION

v.

CONTINENTAL CASUALTY
INSURANCE COMPANY;
TRANSPORTATION INSURANCE
COMPANY,
                    Appellant
_____

On Appeal from the United States
District Court for the
District of New Jersey
(Dist. Ct. No. 00-cv-04274)
District Judge: Honorable Joseph E.
Irenas
_____

Argued December 9, 2003

Before: AMBRO, FUENTES, and
CHERTOFF, Circuit Judges.

(Filed: August 6, 2004)

GERARD J. JACKSON, ESQ. (Argued)
1260 Marlkress Road
P.O. Box 1820
Cherry Hill, NJ 08034
          Counsel for Appellees

SHEILA A. HAREN, ESQ. (Argued)
MONICA E. O'NEILL, ESQ.
Post & Schell, P.C.
1600 John F. Kennedy Blvd, 13th Floor
Four Penn Center
Philadelphia, PA 19103
          Counsel for Appellant
_____


OPINION
_____


CHERTOFF, Circuit Judge.

Appellees Jack and Marie Buczek and Michael and Sandy Neill are the sole and exclusive members of an unincorporated condominium association known as "Meadows Condominium Association" ("Owners"). The Owners commenced the underlying contract action against Transportation Insurance Company ("Transportation") and Continental Casualty Insurance Company ("Continental")[1] in the United States District Court for the District of New Jersey on August 31, 2000. The Owners sued the two insurance companies following the denial of their condominium

_____

[1] Continental Insurance Company is not an appellant in this matter. The Owners have not appealed the District Court's decision to dismiss all claims against Continental.

insurance claim, and they asserted claims for breach of contract and breach of the duty of good faith dealing. At the conclusion of the proceedings, the District Court entered a judgment in favor of the Owners and against Transportation in the amount of $103,634.00. Over a series of amended orders, the District Court also granted costs and prejudgment interest to the Owners. For the reasons set out below, we will reverse the orders of the District Court and vacate the judgment entered in favor of the Owners.

I.

The Buczeks, citizens of the Commonwealth of Pennsylvania, and the Neills, citizens of the State of New Jersey; purchased in 1986 a three-story, two-unit structure known as Meadows Condominium located in Wildwood, New Jersey. At the time of their condominium purchase, the Owners obtained from Transportation, an Illinois corporation, an all-risk policy of insurance ("the Policy") to cover the Condominium Association. "All-risks insurance is a special type of insurance extending to risks not usually contemplated, and generally allows recovery for all fortuitous losses, unless the policy contains a specific exclusion expressly excluding the loss from coverage." Jane Massey Draper, Annotation, Coverage Under All-Risk Insurance, 30 A.L.R. 5th 170 (2004).

Built on filled marshland, the condominium building is located on an inlet and was supported by thirty-four wooden pilings, which extended from approximately three to four feet above grade to approximately forty feet into the ground. As the District Court established and the record clearly reflects, the pilings served as the foundation for the house. About November 1, 1998, the Owners noticed that their structure was swaying in high winds. They investigated the problem in the Spring of 1999 and found visible discoloration on the surface level of the pilings that supported the building. A general contractor, exterminator, and engineer were retained to investigate the situation further.

On April 5, 1999, the structure was jacked up approximately one foot, and two longitudinal steel beams were inserted under the building for support. Local code enforcement officials deemed the temporary foundation to be unsatisfactory and dangerous and required that the building be secured and anchored to another temporary or permanent foundation.

The Owners decided to replace the rotted portions of the existing pilings with concrete beams over the piles, building up a foundation wall from the concrete beams to the house. The Owners claim that the replacement costs were approximately $103,634.00. On April 22, 1999, the Owners submitted a Notice of Loss to Transportation. The Owners described the loss as follows: "supports [of] building rotted and wood boring beetles took over" and that the loss occurred on or about November 1, 1998. App. 254a.

On May 22, 1999, Irving

2

Fruchtman, an engineer retained by the Owners, inspected the property and discovered that the pilings had rotted from just below the water surface level to approximately one foot below grade. Wood samples from the pilings were analyzed, and it was determined that wood-destroying fungi and anaerobic bacteria were present in the pilings in addition to brown rot or decay. Transportation's own investigation yielded similar findings. Transportation issued a written denial of the Owners' claim on October 6, 1999, noting, "[s]ince the pilings are the cause of the loss, and not covered property under the policy, [the company] must respectfully deny any voluntary assistance or payment for this loss." App. 257a.

On August 31, 2000, the Owners filed the underlying contract action in District Court. Following a three-day jury trial, the District Court decided the matter on motions pursuant to Rules 50(a)(1) and 50(a)(2) of the Federal Rules of Civil Procedure. On March 1, 2002, the Court entered judgment against Transportation in the amount of $103,634.00. The Court subsequently granted the Owners' request for pre-judgment interest on the contract obligation and amended the judgment to $117,197.49, reflecting interest in the amount of $13,563.49. On June 17, 2002, the District Court entered an order denying Transportation's post-trial motions. On October 15, 2002, the District Court awarded costs of $1,778.71 to the Owners.

This appeal consolidates four appeals timely filed by Transportation contesting the District Court's March 1, 2002 judgment; the May 31, 2002 amended judgment; the June 17, 2002 order denying Appellant's post-trial motions; and the October 16, 2002 order awarding costs. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

II.

Transportation appeals the District Court's conclusion that the Owners were entitled to coverage under the Policy and argues that this Court should rule that it is entitled to judgment as a matter of law. In the alternative, Transportation argues that it is entitled to a new trial because the District Court "remov[ed] numerous critical factual issues from the jury" and improperly took judicial notice of an issue of importance in this case. Appellant's Br. at 9. Finally, Transportation claims that it is entitled to a remittitur because the District Court granted damages not recoverable under the Policy.

We exercise plenary review over the District Court's decision to grant the Owners' motions for judgment as a matter of law. Goodman v. Penn. Tpk. Comm'n, 293 F.3d 655, 664-65 (3d Cir. 2002). "In reviewing the grant of a judgment as a matter of law under Fed. R. Civ. P. 50 following a jury verdict, we must view the evidence in the light most favorable to the non-moving party, and determine whether the record contains the 'minimum quantum of evidence from which a jury might reasonably afford relief.'" Glenn Distribs. Corp. v. Carlisle Plastics, Inc.,

3

297 F.3d 294, 299 (3d Cir. 2002) (quoting Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691 (3d Cir. 1993)).

The parties agree that New Jersey law applies to this case, as do we. Determination of the proper coverage of an insurance contract is a question of law. Atlantic Mut. Ins. Co. v. Palisades Safety and Ins. Ass'n., 837 A.2d 1096, 1098 (N.J. Super. Ct. App. Div. 2003).[2] An insurance policy should be interpreted according to its plain meaning. Benjamin Moore & Co. v. Aetna Cas. & Sur. Co., 843 A.2d 1094, 1103 (N.J. 2004) (internal citations omitted). Where the express language of the policy is clear and unambiguous, "the court is bound to

enforce the policy as it is written." Royal Ins. Co. v. Rutgers Cas. Ins. Co., 638 A.2d 924, 927 (N.J. Super. Ct. App. Div. 1994) (quoting Flynn v. Hartford Fire Ins. Co., 370 A.2d 61, 63 (N.J. Super. Ct. App. Div. 1977)). However, in the absence of any ambiguity, courts should not write for the insured a better policy of insurance than the one purchased. Vassiliu v. Daimler Chrysler Corp., 839 A.2d 863, 867 (N.J. 2004). A genuine ambiguity exists "where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." Lee v. Gen. Accident Ins. Co., 767 A.2d 985, 987 (N.J. Super. Ct. App. Div. 2001). When the terms of coverage are ambiguous, "that doubt is ordinarily resolved in favor of the insured." Moore, 843 A.2d at 1103.

A.

The "Condominium Association Coverage Form" sets out the terms of coverage for "Covered Property." In pertinent part, the Policy provides:

> A. COVERAGE
> We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.
>
> 1. Covered Property
> Covered Property, as used

---

[2] We review the District Court's interpretation of state law de novo. Wiley v. State Farm Fire & Cas. Co., 995 F.2d 457, 459 (3d Cir. 1993). In adjudicating a case under state law, we are not free to impose our own view of what state law should be; rather, we are to apply existing state law as interpreted by the state's highest court in an effort to predict how that court would decide the precise legal issues before us. Kowalsky v. Long Beach Township, 72 F.3d 385, 388 (3d Cir. 1995). In the absence of such guidance, we must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue. Wiley, 995 F.2d at 459-60.

4

in this Coverage Part, means the type of property described in this section A.1., and limited in A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

a. Building, meaning the building or structure described in the Declarations, including:
(1) Completed additions;
(2) Fixtures, outside of individual units, including outdoor fixtures;
(3) Permanently installed:
(a) Machinery and
(b) Equipment;
\*\*\*
2.     Property Not Covered
Covered Property does not include:
\*\*\*
f. The cost of excavations, grading, back filling or filling;
g. Foundations of buildings, structures, machinery or boilers if their foundations are below:
(1) The lowest basement floor; or
(2) The surface of the ground if there is no basement.
\*\*\*
j. Bulkheads, pilings, piers,

wharves or docks;
\*\*\*
3.     Covered Causes of Loss
See applicable Causes of Loss Form as shown in the Declarations.

App. 201-03a.
The "Causes of Loss– Special Form" details the types of "Covered Causes of Loss" covered by Transportation. It provides:

A.     COVERED CAUSES OF LOSS
When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
1.     Excluded in Section B., Exclusions; or
2.     Limited in Section C., Limitations; that follow.

B.     EXCLUSIONS
\*\*\*
2.     We will not pay for loss or damage caused by or resulting from any of the following:
\*\*\*
d.
(1) Wear and tear;
(2) Rust, corrosion, fungus, decay, deterioration, hidden or latent defect or any

5

quality in property that causes it to damage or destroy itself . . .

App. 216-17a.

In a decision issued from the bench following the conclusion of the Owners' and Transportation's cases, the District Court established that the Owners' claims would not be covered under the terms of the General Insurance Policy. App. 780a. To the extent that the Owners argue otherwise and claim that the pilings are insured as "Covered Property," we disagree. As the District Court's opinion and the record establish, the pilings served as the foundation for the building, and the language of the Policy clearly excludes both foundations and "pilings" as "Covered Property."

The District Court concluded nevertheless that coverage was warranted under the Section D "Additional Coverage – Collapse" provision of the Policy (the "Collapse Clause"). Transportation disputes this ruling.

The Additional Coverage clause reads:

> 3. ADDITIONAL COVERAGE – COLLAPSE
> The term Covered Cause of Loss includes the Additional Coverage - Collapse as described and limited in D.1 through D.5 below.
>
> 1. We will pay for direct physical loss or damage to

Covered Property caused by collapse of a building or any part of a building insured under this Coverage Form, if the collapse is caused by one or more of the following:
> \*\*\*
> b. Hidden decay;
> c. Hidden insect or vermin damage;
> \*\*\*

App. 221a.

Since the pilings were damaged by hidden decay, the applicability of this clause turns on whether there was damage to the Covered Property— i.e., the building— caused by "collapse." The word "collapse," as used in insurance policies, has been litigated for many years. See Annotation, What Constitutes "Collapse" of a Building Within Coverage of Property Insurance Policy, 71 A.L.R. 3d 1072 (1976). As this Court discussed in Ercolani v. Excelsior Insurance Co., 830 F.2d 31 (3d Cir. 1987), courts have not uniformly agreed on what constitutes the collapse of a building under the collapse coverage of a casualty insurance policy. Id. at 34.

Some courts have adopted a "narrow" interpretation, requiring coverage only where a building has fallen down or caved in. See id. However, as the District Court noted, New Jersey follows an alternative approach, i.e., the

6

"majority rule." Our opinion in Ercolani predicted, "New Jersey courts would . . . read the collapse peril as covering serious impairment of structural integrity making the wall no longer capable of supporting the house's superstructure." Id. at 34.[3] In Fantis Foods, Inc. v. North River Insurance Co., 753 A.2d 176, 183 (N.J. Super. Ct. App. Div. 2000), the New Jersey Appellate Division echoed our holding in Ercolani and decided that the definition of collapse "must be taken to cover any serious impairment of structural integrity that connotes *imminent* collapse threatening the preservation of the building as a structure or the health and safety of occupants and passers-by." Fantis, 753 A.2d at 183 (emphasis added).

After mulling the parameters of what would be considered "imminent," the District Judge made two pivotal findings. First, he accepted testimony that ninety mile-per-hour winds would cause the building to collapse, and second, he took judicial notice that ninety mile-per-hour winds sometimes hit the New Jersey shore. App. 767-68a. The District Judge concluded, "I'm holding that even a risk that might be a one in ten, or one in twenty year risk, is still a very serious and

imminent risk. The fact the event may or may not occur in any given point in time doesn't mean the risk is not imminent." Id. In short, the District Court concluded that the house's vulnerability to ninety mile-per-hour winds, which may occur once in twenty years, constituted "imminent collapse."

We disagree with the District Court's definition of "imminent collapse." Certainly our decision in Ercolani made it clear that a house need not be in a pile of rubble before it is deemed "collapsed." However, even if we assume that a ninety mile-per-hour wind might occur once every ten or twenty years, that is still not an "imminent" risk.[4]

---

[3] At the time of our decision in Ercolani, the New Jersey courts had yet to determine which interpretation of "collapse" would be the determinate rule, leaving this Court to predict how the New Jersey Supreme Court would rule. 830 F.3d at 34.

[4] We do note, however, that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Indeed, on this appeal, the Owners' own evidence, an Army Corps of Engineers survey, cited only two instances in the last sixty-eight years where winds at Atlantic City reached ninety miles-per-hour. Other government data seems to suggest no storms in the Jersey shore in the past century achieved winds of ninety miles-per-hour. National Climate Data Center, National Oceanic and Atmospheric Administration, 1899-1996 U.S.

"Imminent" is defined as "ready to take place: near at hand," Webster's Third New International Dictionary 1130 (1st ed. 1966), and "likely to occur at any moment: impending," The Random House Dictionary of the English Language 957 (2d ed. 1987). As one court has observed, "imminent" means collapse "likely to happen without delay." See Ocean Winds Council of Co-Owners v. Auto-Owner Ins. Co., 565 S.E.2d 306, 308 (S.C. 2002); see also Doheny West Homeowners Ass'n v. Am. Guarantee & Liab. Ins. Co., 70 Cal.Rptr.2d 260, 264 (Cal. App. 2 Dist.,1997) ("'likely to happen without delay'" (quoting Webster's New World Dictionary (3d college ed. 1991))).

The District Court's findings on the "imminent" threat to the structural integrity of the condominium contrast with the findings of imminence relied upon by this Court in Ercolani and by the New Jersey Appellate Division in Fantis. Here, the District Court noted, "[there was] no observable damage [to the house]. . . . [D]rywall wasn't flying apart. Flashing wasn't coming apart. The walls weren't bulging or cracking which sometimes happen when a house becomes out of whack, did not exist." App. 765a. However, in Ercolani, the policyholder

---

Landfalling Major Hurricanes– GIF Maps, available at http://lwf.ncdc.noaa.gov/img/climate/severeweather/2hur9996.gif (last visited July 8, 2004). This kind of disputed fact is not one that is appropriate for judicial notice.

"heard loud moaning and shrieking noises emanating from the south basement wall, noticed a crack in it, and observed it move and bulge inward." 830 F.2d at 33. Likewise, in Fantis Foods, the masonry consultant who inspected the damaged property noted, "'[t]he main cause of the parapet walls [sic] displacement and imminent collapse is hidden decay of steel beams and lintels which are located or behind the brick masonry walls'" and that the "'[n]orth wall parapet has the emergency condition.'" Fantis, 753 A.2d at 180.

In short, the District Court's interpretation of "imminent" wrenched it from any reasonable definition of the word.[5]

---

[5] We need not consider whether our decision would be different if there was evidence in the record that a common gust of wind would knock the structure down. The Owners chose to offer evidence only as to the effect of ninety mile-per-hour winds on the house. The District Court tried in vain to probe whether the house was threatened with collapse by less powerful winds. App. 304-05a. But as Judge Irenas explained, "[Fructman] didn't say . . . it would collapse on its own. I tried to get him to say that. I asked, would a lesser [sic] wind, [e.g.,] a forty [or] thirty [mile-per-hour wind], . . . [would] make the thing fall. His answer was, I only did calculations for ninety miles-an-hour. Nothing [Transportation's expert] Honig[] said [was] anything

### B.

The Owners also argue that Transportation was responsible for the renovation costs because the Owners were obliged to renovate under their duty to minimize losses and mitigate damages.[6]

---

different." App. 786a. Having chosen to try the case on the theory that the house was vulnerable to the rare threat of a ninety mile-per-hour wind, the Owners are bound to accept the consequence of our determination that such a threat is not imminent and cannot serve to support a finding of "collapse."

[6] The Owners also cite <u>Harr v. Allstate Insurance Co.</u>, 255 A.2d 208 (N.J. 1969), for the proposition that Transportation should be estopped from denying coverage because the Owners relied on the language of the "Duties" clause articulated in the Policy and copied in a letter sent by the Company that was dated April 30, 1999. The Owners' reliance on <u>Harr</u> is misplaced. In that case, the New Jersey Supreme Court provided that equitable estoppel was available in "appropriate circumstances." <u>Id.</u> at 219.

> These decisions all proceed on the thesis that where an insurer or its agent misrepresents, even though innocently, the coverage of an insurance contract, or the

By way of analogy, they point to the so-called "Sue and Labor" insurance clauses, which oblige insurance companies to reimburse expenses to insured parties who spend money to avert harm to covered property and to mitigate damages.

Two provisions in the Policy appear to resemble traditional "Sue and Labor" provisions found in other "all-risk" insurance policies: the "Preservation of Property" and "Duties in the Event of Loss or Damage" provisions.

The Preservation clause provides:

> b. Preservation of Property
> If it is necessary for you to move Covered Property

---

> exclusions therefrom, to an insured before or at the inception of the contract, and the insured reasonably relies thereupon to his ultimate detriment, the insurer is estopped to deny coverage after a loss on a risk or from a peril actually not covered by the terms of the policy.

<u>Id.</u> That case is clearly distinguishable from the matter at hand. The District Court found no evidence of misrepresentation regarding the coverage of insurance policy, as evidenced by its rejection of the bad faith claim against Transportation. <u>See</u> App. 798-99a.

9

from the described premises to preserve it from loss or damage by a *Covered Cause of Loss*, we will pay for any direct physical loss or damage to that property:

(1) While it is being moved or while temporarily stored at another location; and

(2) Only if the loss or damage occurs within 30 days after the property is first moved.

App. 204a (emphasis added).

The District Court indicated that it relied on the Preservation of Property Clause in concluding that the Owners were entitled to coverage. The Court explained, "I think that there is [sic] mutual obligations, obligations on the part of the insured to do that, preserve the property and obligations for them to pay for it. The insured did it." App. 793a.

The Preservation Clause provides coverage only in instances where a "Covered Cause of Loss" is implicated. But absent a finding of "collapse" under the Collapse Clause, the Owners do not have a "Covered Cause of Loss."[7]

_____

[7] Absent a "Covered Cause of Loss," we find no need to delve into the issues of what constitutes something "being moved" to another location or what items constitute "Covered Property" under

The Owners also refer to the language of the "Duties in the Event of Loss or Damage" Clause in the Policy. This Clause provides:

3. Duties in the Event of Loss or Damage
a. You must see that the following are done in the event of loss or damage to Covered Property:
   ***
(4) Take all reasonable steps to protect the Covered Property from further damage. *. . . However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss.*

App. 208a (emphasis added).

Once again, the language clearly provides that loss or damage resulting from a cause of loss that is not a "Covered Cause of Loss" is excluded from coverage. Id. As we articulated in our discussion of the Preservation Clause, the Owners have not established a "Covered Cause of Loss" that would warrant coverage under the Policy.

The Owners finally cite Broadwell

_____

the Policy.

10

Realty Services, Inc. v. Fidelity and Casualty Company of New York, 528 A.2d 76 (N.J. Super. Ct. App. Div. 1987), for the proposition that an insured has a common law duty to prevent harm to the property and that an insurer has a corresponding obligation to reimburse the insured for out-of-pocket expenditures for these efforts. This case, however, is clearly distinguishable.

First, the policy at issue in Broadwell was a general liability policy, not an "all-risk" policy purchased by the Owners. "General liability policies are not 'all-risk' policies . . . . They provide an insured with indemnification for damages up to policy limits for which the insured becomes liable as a result of tort liability to a third party." Standard Const. Co., Inc. v. Maryland Cas. Co., 359 F.3d 846, 852-53 (6th Cir. 2004) (internal citations omitted); see also Lenning v. Commercial Union Ins. Co., 260 F.3d 574, 584 (6th Cir. 2001) (emphasis omitted). The issue in Broadwell was whether the insurer had to reimburse the insured for steps taken to prevent damages to a third party *which were covered* under the policy. Significantly, the Broadwell court denied coverage for the preventive measures taken by the insured because the liability policy excluded the insured's property from coverage. 528 A.2d at 528.

Simply put, the insurer's obligation to reimburse for acts taken to preserve or protect Covered Property does not extend to require reimbursement for prevention of damage to property that is excluded from coverage or for a circumstance that is not a covered cause of loss. As we observed in GTE Corp. v. Allendale Mut. Ins. Co., addressing "Sue and Labor" clauses, "an alternative interpretation would permit [an insured party] to recover for improvements and measures taken to address a host of uninsured risks." 372 F.3d 598, 618 (3d Cir. 2004).

Accordingly, we will vacate the judgment (as amended) of the District Court, vacate the awards of prejudgment interest and costs, and remand for judgment to be entered in favor of Transportation Insurance Company.

11