# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-1929
No. 10-2071

_____

KAAPA Ethanol, LLC,

    Plaintiff - Appellee/
Cross Appellant,

v.

Affiliated FM Insurance Company,

    Defendant - Appellant/
Cross Appellee.

\*
\*
\*
\*
\*
\*   Appeals from the United States
\*   District Court for the
\*   District of Nebraska.
\*
\*
\*
\*

_____

Submitted: June 13, 2011
Filed: November 3, 2011

_____

Before LOKEN, BEAM, and GRUENDER, Circuit Judges.

_____

LOKEN, Circuit Judge.

KAAPA Ethanol ("KAAPA") manages a facility in Kearney County, Nebraska that distills corn into ethanol, a biofuel additive for gasoline. The plant was insured against property damage by an "all-risk" insurance policy issued by Affiliated FM Insurance Company ("Affiliated"). Soon after KAAPA began production, the plant's ethanol production and storage tanks began to lean, their foundations began showing visible signs of distress, and their supporting concrete walls sunk into the ground. KAAPA commenced this diversity action after Affiliated denied KAAPA's claim to

recover the cost of extensive repairs and business interruption losses. After a lengthy trial, the jury found that some losses were caused by "collapse" of the tanks, awarded KAAPA property damages of nearly $4 million, but denied its claim for business interruption losses. Both sides appeal raising various issues. Applying Nebraska law, we affirm the district court's denial of Affiliated's motion for judgment as a matter of law. But we conclude the court committed reversible error in instructing the jury on the meaning of the term "collapse" and remand for a new trial. We do not decide the loss-mitigation and other post-trial issues raised in KAAPA's cross-appeal.

## I. Background

**A. KAAPA's Losses.** The KAAPA plant consisted of nine large, cylindrical, stainless steel tanks fabricated onsite: one 980,000-gallon "beerwell" tank, three 730,000-gallon "fermenter" tanks, and five "process-liquid" tanks. The base of each tank was bolted to a circular concrete "ring-wall" foundation. The tank floors rested directly on material that filled the ring walls' interior (the "infill"), which was graded to match the downward slope of the conical-shaped tank bottoms. The following diagram is a cross-section of a fermenter tank and its foundation:



| Ninyo & Moore | | TYPICAL SOIL PROFILE | FIGURE |
|---|---|---|---|
| PROJECT NO. | DATE | KAAPA ETHANOL FACILITY | |
| 206621001 | 12/07 | KEARNEY COUNTY, NEBRASKA | 3 |

At trial, several witnesses testified to extensive damage to the tanks that commenced soon after the plant began operations in late 2003. The beerwell and fermenter tanks experienced unusual movement and the structures began to shift in a way that "put them in jeopardy." The plant manager noticed anchor bolts being "bent inward" and "pulled in," which caused cracking and spalling of the concrete ring walls. Part of one tank slipped off its concrete base into the interior of the ring wall. A site survey reported that all four of the larger tanks were "out of plumb," meaning they were no longer precisely vertical, and that the ring walls of each had sunk

downward between 3.4 and 10.8 inches.  By November 2004, KAAPA was notified that its beerwell tank was out of "API 650" tolerances and should be taken out of service immediately.

KAAPA retained a geotechnical engineer to investigate.  He reported that an onsite "silty clay" had been used for the infill, instead of the "compacted granular fill" called for in engineering drawings.  This onsite material was "inherently weak," not a proper material for the contact pressures exerted by the tanks.  In late 2004 and early 2005, KAAPA stabilized the sinking ring-wall foundations by injecting columns of grout around each tank's perimeter.  This halted the sinking, but the "soils within the region of the ring wall were still undergoing distress."  Less than a year later, the plant manager noticed additional chipping and spalling of the ring walls supporting the beerwell and fermenter tanks, and a site survey reported one fermenter tank out of plumb.  By late 2005, the five smaller process-liquid tanks were experiencing similar problems -- bent anchor bolts and pulling off of the ring-wall foundations.  The plant manager and KAAPA engineers were concerned that the tanks were no longer sitting on their ring walls and might tip over.

KAAPA retained Karges-Faulconbridge, Inc. ("KFI") to address the problems. KFI implemented a comprehensive year-long plan to repair all nine tanks while the plant continued operations.  Each tank being repaired was emptied and raised so that its weight was no longer bearing on the infill.  The floor was then removed and a dirt ramp constructed to allow access to the surface of the infill.  After the infill was removed and the underground drainage pipes and ring wall repaired, the infill was replaced with a "lean concrete mix."  The floor was replaced, the tank resealed, the stainless steel walls "pulled" into shape and replaced on the ring-wall foundation, and the anchor bolts straightened and reattached.  The tank was then returned to service.

**B.  The Affiliated Policy**.  At all times in question, the KAAPA plant was covered by Affiliated's "all-risk" Standard Fire Insurance Policy.  The policy covered

-4-

"all risks of direct physical loss or damage to the insured property except as excluded under this policy." The following exclusions are at issue in this case:

> **GROUP II.** This policy does not insure against loss or damage caused by the following perils; however, if loss or damage not excluded results, then that resulting loss or damage is covered.
>
> \*     \*     \*     \*     \*
>
> **2.** Defects in materials, faulty workmanship, faulty construction or faulty design.
>
> \*     \*     \*     \*     \*
>
> **7.** Settling, cracking, shrinkage, bulging, or expansion of [foundations, walls, floors, roofs, or ceilings]. This exclusion will not apply to loss or damage resulting from collapse of: a building or structure; or material part of a building or structure.

We will refer to the "however" clause prefacing the Group II exclusions as the "ensuing-loss clause."[1] The second sentence of the settling exclusion is the only reference to "collapse" in the policy's coverage and exclusion provisions.

**C. The Coverage Issues.** After KAAPA notified Affiliated of ongoing losses in the fall of 2004, Affiliated concluded that "inappropriate materials (soil) were used in the foundation system" and denied coverage in January 2005, citing the faulty workmanship and settling exclusions. KAAPA submitted additional claims as more problems emerged and additional repairs were implemented in 2006-2007. When Affiliated again denied the claims, KAAPA filed this lawsuit, asserting claims for

---

[1]An ensuing-loss clause provides coverage when an excluded peril leads to loss from an "independent" non-excluded peril. Weeks v. Co-Operative Ins. Cos., 817 A.2d 292, 296 (N.H. 2003).

breach of the insurance contract and bad-faith. Prior to trial, the district court dismissed the bad faith claim. KAAPA does not appeal that ruling.

At the close of the evidence, the district court gave the following relevant final instructions to the jury:

> 14. . . . KAAPA has the burden of proving . . . that its losses were the result of a fortuitous event or risk.

> 16. The insurance policy provides coverage for loss or damage caused by collapse. "Collapse" means substantial impairment of the structural integrity of a building or any part of a building. A structure or part of a structure does not need to fall down or be in imminent danger of falling down in order for it to have "collapsed," nor do you need to find that the structure was either abandoned or taken out of use.

> KAAPA has the burden of proving . . . that some or all of its losses were caused by collapse.

> If you find that some or all of KAAPA's losses were caused by . . . collapse, you must return a verdict in favor of KAAPA . . . .

> 17. [After quoting the faulty workmanship and settling exclusions], Affiliated has the burden of proving . . . that some or all of KAAPA's losses were caused by one or more of these exclusions.

> 18. If you find that one or more of the exclusions relied upon by Affiliated FM apply to KAAPA's claim, you must then determine whether the insurance policy's "ensuing loss" provision applies to KAAPA's claim.

> 19. In determining whether an exclusion applies . . . you must determine what was the efficient proximate cause of any loss or damage. The proximate cause to which the loss is to be attributed is the dominant cause, the efficient one that sets the other causes in operation . . . .

If the efficient proximate cause is not covered . . . there is no coverage unless an unexcluded loss results from damage caused by an excluded cause [an ensuing loss].

Affiliated objected only to the last sentence of the first paragraph of Instruction 16.

On the Verdict Form, the jury found that some of KAAPA's losses "were caused by an excluded peril," that some of its losses "were caused by collapse," and that no losses were covered under the ensuing-loss clause. The district court denied Affiliated's motion for judgment as a matter of law or a new trial, upheld the award of nearly $4 million damages for losses caused by collapse, substantially reduced the jury's award of mitigation expenses, awarded KAAPA reduced attorneys fees and expenses, and entered final judgment on the jury verdict as so modified.

## II. Discussion

**A.** On appeal, Affiliated first argues that it is entitled to judgment as a matter of law because the efficient proximate cause of KAAPA's loss was an excluded peril, faulty workmanship. There was no evidence of additional damage "caused by" collapse, Affiliated asserts, and in any event the jury found no loss covered by the ensuing-loss clause. In other words, Affiliated argues that KAAPA's claim involved losses that were the *effect* of collapse caused by faulty workmanship, not losses *caused* by collapse. This argument requires analysis of the extent to which Affiliated's all-risk policy provided coverage for "collapse."

Historically, fire insurance policies provided that coverage was extinguished by a building's collapse. With the advent of all-risk policies, insurers began adding specific provisions excluding collapse losses and then, in some policies, covering some or all such losses by special endorsement. See generally Annotation, What Constitutes "Collapse" of a Building Within Coverage of Property Insurance Policy, 71 A.L.R.3d 1072 (1976). Many reported cases around the country have interpreted

policy provisions covering or excluding collapse losses. Our extensive review of these cases suggests that Affiliated's policy was unusual because it contained no specific "collapse" provision, other than the exception at the end of the settling exclusion for "loss or damage resulting from collapse."[2] Affiliated argues that, while "collapse is not on the list of [policy] exclusions and thus would be a covered peril," the policy did not provide "collapse coverage." Therefore, the only coverage for collapse caused by an excluded peril such as faulty workmanship would be for a loss independent of the collapse but caused by the collapse. There are cases supporting this contention, although few courts have addressed the issue. See Vision One, LLC v. Phila. Indem. Ins. Co., 241 P.3d 429, 437 & n.3 (Wash. App. 2010) (when an excluded cause causes collapse, there is no independent covered peril), review granted, 249 P.3d 182 (Wash. 2011);[3] Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co., 219 F.3d 501, 507 (5th Cir. 2000).

We reject this contention because it was not properly preserved for appeal. In Instruction No. 16, the district court told the jury, categorically: "The insurance policy provides coverage for loss or damage caused by collapse. . . . If you find that some or all of KAAPA's losses were caused by . . . collapse, you must return a verdict in favor of KAAPA." In other words, the jury was instructed that collapse losses were

---

[2]In many cases where collapse damages were disputed, the polices at issue included "Additional Coverage for Collapse" provisions that affirmatively provided coverage for this type of loss. See, e.g., Council Tower Ass'n v. Axis Specialty Ins. Co., 630 F.3d 725, 727 (8th Cir. 2011); Dalton v. Harleysville Worcester Mut. Ins. Co., 557 F.3d 88, 90 (2d Cir. 2009); Am. Concept Ins. Co. v. Jones, 935 F. Supp. 1220, 1225 (D. Utah 1996).

[3]The court in Vision One gave a useful example of ensuing-loss coverage: "following the destruction caused by the 1906 San Francisco earthquake, gas-fed fires broke out and caused even more damage across the city. Most property insurance policies excluded earthquake damage but covered fire damage. Because an excluded peril (earthquake) caused an [intermediate] covered peril (fire), the resulting fire damage was covered." 241 P.3d at 437.

a covered *risk* under the policy, even if the collapse was caused by an excluded peril such as faulty workmanship.[4] Under this interpretation of the policy, the jury reasonably concluded that the ensuing loss clause was irrelevant to its task. By failing to object to this portion of Instruction No. 16, Affiliated forfeited its argument on appeal that the policy did not provide "collapse coverage." Thus, the only issue before us on appeal is whether the district court properly left to the jury the fact-intensive determination of the extent to which collapse, rather than faulty workmanship, was the efficient proximate cause of KAAPA's extensive losses.

The district court instructed the jury, without objection, that the efficient proximate cause of KAAPA's loss meant "the dominant cause, the efficient one that sets the other causes in operation." Under the definition of "collapse" included in the district court's instructions, or the definition we conclude in the next section of this opinion should have been given, the evidence was clearly sufficient for the jury to find that the dominant cause of at least some of KAAPA's losses was a "collapse" of the tanks. The denial of Affiliated's motion for judgment as a matter of law on these issues is affirmed. We reject Affiliated's related argument that there was no collapse as a matter of law. This was a hotly-contested issue. On these complex facts, it was properly submitted to the jury.

---

[4]The district court's interpretation of the policy is supported by the Supreme Court of Nebraska's only decision resolving collapse coverage issues. In <u>Morton v. Travelers Indem. Co.</u>, 106 N.W.2d 710, 713 (Neb. 1960), a Comprehensive Dwelling Policy covered "multiple enumerated scheduled risks" including "collapse." The Court held that the policy covered the costs of repairing both collapse damage and other damage caused by the collapse. <u>Id.</u> at 716-17. This treated "collapse" as both a covered "risk" and a loss-causing "peril." The extent of coverage should be the same under an all-risk policy. Arguably, this interpretation of the policy's insuring clause rendered the "collapse" exception in the settling exclusion surplusage, contrary to a well-recognized rule of insurance policy construction. <u>See</u> <u>Gies v. City of Gering</u>, 695 N.W.2d 180, 189 (Neb. App. 2005). But that question is not before us.

**B.** Affiliated next argues that the district court erred in instructing the jury when a collapse has occurred under Nebraska law. Although the issue is not free from doubt, we agree. We further conclude that the error prejudiced Affiliated's defense of this critical coverage issue; therefore, a new trial is necessary. See Bening v. Muegler, 67 F.3d 691, 696 (8th Cir. 1995) (standard of review).

Ever since first-party insurance policies began including "collapse" coverages and exclusions over fifty years ago, courts have disagreed whether the collapse of a structure requires proof of a "falling in . . . loss of shape, [or] reduction to flattened form or rubble" (the "rubble-on-the-ground" standard), or only proof of damage that materially impaired the structure's "substantial integrity" (the "material-impairment" standard). Compare Cent. Mut. Ins. Co. v. Royal, 113 So.2d 680, 683 (Ala. 1959), with Jenkins v. U.S. Fire Ins. Co., 347 P.2d 417, 422-23 (Kan. 1959). It is undisputed that the Supreme Court of Nebraska adopted the material-impairment standard in Morton, 106 N.W.2d at 720-21. That standard has since become the majority view. But some courts applying the standard in later cases have ruled that a structure must be in "imminent danger" of falling to the ground, or must be abandoned or taken out of service, before a material impairment will constitute a collapse.

In denying pretrial cross motions for summary judgment that raised these issues, the district court adopted the magistrate judge's recommendation: "There is no reason to believe the Nebraska Supreme Court . . . would . . . require KAAPA to prove not only a substantial impairment of the structural integrity of its tanks, but that due to this impairment, collapse was 'imminent.'" In support, the magistrate judge cited only Sandalwood Condo. Ass'n at Wildwood, Inc. v. Allstate Ins. Co., 294 F. Supp. 2d 1315, 1318 (M.D. Fla. 2003) (applying Florida law). Affiliated preserved its contrary contention during the jury-instruction phase of the trial, submitting proposed instructions requiring proof that an actual collapse is imminent or that the structure is unsafe or unusable, and objecting at the charging conference to the second sentence of what the district court later gave as Instruction No. 16:

-10-

16. . . . "Collapse" means substantial impairment of the structural integrity of a building or any part of a building. <u>A structure or part of a structure does not need to fall down or be in imminent danger of falling down in order for it to have "collapsed," nor do you need to find that the structure was either abandoned or taken out of use.</u>

(Emphasis added.) On appeal, we review *de novo* Affiliated's contention that this sentence, given at KAAPA's request, incorrectly interpreted the insurance policy. <u>See Archer Daniels Midland Co. v. Aon Risk Servs., Inc. of Minn.</u> 356 F.3d 850, 855 (8th Cir. 2004).

**1. Imminence.** There was evidence in <u>Morton</u> that the dwelling's basement walls "needed to be replaced or repaired . . . because they could completely collapse in the foreseeable future." 106 N.W.2d at 715. Affiliated argues that, if presented with the question, the Supreme Court of Nebraska would require, as have most courts applying the material-impairment standard in more recent cases, a showing that actual collapse "be imminent before coverage exists." <u>Zoo Props., LLP v. Midwest Family Mut. Ins. Co.</u>, 797 N.W.2d 779, 781-82 (S.D. 2011). In this context, "'[i]mminent' means collapse is 'likely to happen without delay; impending or threatening;' and requires a showing of more than substantial impairment." <u>Ocean Winds Council of Co-Owners, Inc. v. Auto-Owner Ins. Co.</u>, 565 S.E.2d 306, 308 (S.C. 2002).

Courts have required proof of imminence because that requirement "is consistent with the policy language and the reasonable expectations of the insured" and "avoids both the absurdity of requiring an insured to wait for a seriously damaged building to fall and the improper extension of coverage" that would convert the policy "into a maintenance agreement." <u>Doheny W. Homeowners' Ass'n v. Am. Guar. & Liab. Ins. Co.</u>, 70 Cal. Rptr. 2d 260, 264 (Cal. App. 1997). For these reasons, numerous courts have required proof of a serious impairment "that connotes imminent collapse threatening the preservation of the building." <u>Fantis Foods, Inc. v. N. River Ins. Co.</u>, 753 A.2d 176, 183, 185 (N.J. Super. Ct., App. Div. 2000); <u>accord</u> <u>Assur. Co.</u>

of Am. v. Wall & Assocs. LLC of Olympia, 379 F.3d 557, 563 (9th Cir. 2004); Buczek v. Cont'l Cas. Ins. Co., 378 F.3d 284, 290-91 (3d Cir. 2004); Weiner v. Selective Way Ins. Co., 793 A.2d 434, 443 (Del. Super. Ct. 2002). Other cases, while not addressing the issue, have noted that actual collapse was imminent in extending coverage to material impairments of structural integrity. See cases cited in Doheny, 70 Cal. Rptr. at 264-65. To our knowledge, Sandalwood -- the case cited by the magistrate judge -- is the only decision that explicitly considered and rejected an imminence requirement.

After reviewing these authorities, we predict that the Supreme Court of Nebraska would adopt some sort of imminence requirement in applying the material-impairment standard. Bearing in mind the facts in Morton, imposing an imminence requirement is not a departure from controlling Nebraska authority. Rather, it is consistent with the facts in Morton, consistent with the policy language, comports with the reasonable expectations of the parties to the insurance contract, and achieves an appropriate middle ground that avoids either eviscerating catastrophic coverage of collapse, or effectively nullifying the faulty workmanship and settling exclusions. We decline to prescribe the specific terms of an imminence instruction, an issue not addressed in the above-cited cases and better left to the district court's discretion. But we conclude that it was an error of law to instruct the jury to disregard this factor altogether. And on this trial record, we have no doubt that the error prejudiced Affiliated's defense of the hotly-contested issue of "collapse" coverage.

**2. Abandonment.** We reject Affiliated's other contention, that a structure must be abandoned or taken out of service before a material impairment can be found to be a "collapse" under Nebraska law. Without question, that a structure "remained usable and continued to be occupied" may be relevant to whether a "collapse" occurred, particularly in homeowner cases where the settling exclusion is at issue. Sabella v. Wisler, 377 P.2d 889, 895 (Cal. 1963). But where the policy's coverage includes the collapse of a material part of a building, we believe the Supreme Court

-12-

of Nebraska would agree with cases concluding it is not necessary or essential to a finding of collapse that a structure be taken out of service or rendered uninhabitable. See John Akridge Co. v. Travelers Cos., 876 F. Supp. 1, 2 (D.D.C. 1995); Beach v. Middlesex Mut. Assurance Co., 532 A.2d 1297, 1301 (Conn. 1987); N-Ren Corp. v. American Home Assurance Co., 619 F.2d 784, 788 (8th Cir. 1980); Jenkins, 347 P.2d at 423.  Therefore, the district court's instruction, "nor do you need to find that the structure was either abandoned or taken out of use," was not reversible error.  We express no view whether this optional instruction was advisable.

For the foregoing reasons, the judgment of the district court is reversed and the case is remanded for a new trial or other proceedings not inconsistent with this opinion.  Had we reached the issues raised by KAAPA on its cross-appeal, we would have affirmed based on the trial record before us.

_____