[No. G024336. Fourth Dist., Div. Three. July 25, 2001.]

RONALD PANICO et al., Plaintiffs and Appellants, v.
TRUCK INSURANCE EXCHANGE, Defendant and Respondent.

**COUNSEL**

John K. Saur for Plaintiffs and Appellants.

Hollins, Schechter, Feinstein & Condas and Jack H. Snyder for Defendant and Respondent.

**OPINION**

**SILLS, P. J.**—Over the past several years, this court has seen a number of cases where trial judges have attempted to streamline trial proceedings by adjudicating a case from the bench based on offers of proof. (E.g., *Stein-Brief Group, Inc. v. Home Indemnity Co.* (1998) 65 Cal.App.4th 364, 369 [76 Cal.Rptr.2d 3]; cf. *Lokeijak v. City of Irvine* (1998) 65 Cal.App.4th 341, 343, fn. 2 [76 Cal.Rptr.2d 429] [trial court suggested "mini-trial" as alternative to summary judgment].) The appeal before us illustrates how such an "unusual and unorthodox procedure" (*Stein-Brief Group, Inc. v. Home Indemnity Co., supra,* 65 Cal.App.4th at p. 369) may result—unless certain precautions are taken—in an unnecessary reversal of the trial court's judgment, because the Court of Appeal must treat the case as if it were the product of a motion for nonsuit after an opening statement. (*Ibid.*) That means that all the inferences and conflicts in the evidence must be resolved, on appeal, in favor of the losing party, i.e., against the judgment. (*Ibid.*) Had the court simply taken the time to hold a real trial on any disputed issues of fact, or had the parties agreed to have a court trial by submitting evidence (including conflicting evidence) to the judge, the ensuing judgment would be entitled to the usual presumptions, and all factual inferences would be resolved in favor of the winning party, i.e., the judgment of the trial court. The moral to the story is that haste makes for a lower affirmance rate.

I

A

Ronald and Patty Panico, owners of Travis Electronics, made a claim to Truck Insurance Exchange for the loss of various items of Travis's property

that ensued after rain came through the roof and entered the company's storeroom. Truck Insurance denied the claim on the ground that Travis's policy only covered the loss if it was precipitated by the "collapse of a building or any part of a building." The Panicos then instituted this lawsuit, including bad faith claims, and sought a jury trial.

A successful motion for summary judgment in March 1998 eliminated any claims by the Panicos personally (as distinct from Travis Electronics, a corporation), and a separate judgment of dismissal was filed as to them. Travis's claims were scheduled for trial in August 1998. But in a chambers conference before trial was to start, the court invited the attorney for Travis to "make what amounts to its best case factual presentation." The court was then to decide "if those facts were proven" whether there would be, as Truck Insurance contended, "no coverage under the policy."

Travis's attorney then gave a statement, the salient part of which is this: That after four days of rain in November 1994, employees came to work one morning, and "noticed that in their store room, which is located on the second floor of a two-story building, four or five ceiling tiles, acoustical tiles, which I think we can agree were each two by two, had fallen. Some witnesses would say four, some would say six, it's in that range, leaving an opening in the ceiling through which the roof was visible."

The offer of proof continued to the effect that Patty Panico would testify that "she measured that hole in the roof by holding her thumb and forefinger approximately half an inch apart, and holding them up to the ceiling in the room where her deposition was taken as a means of estimating the size of the hole in the roof." Panico "would further testify she saw water coming in through the area where the tiles had been . . . it seemed to her that the water had been pouring through that hole in the ceiling earlier, and it also seemed to her that the source of the water that poured through the hole in the ceiling was the hole in the roof."

Travis's attorney finished his remarks by noting that the court had "informally" ruled in chambers that "even if all those facts were proven under the policy in question the structural integrity of the building not having been either imminently nor actually threatened by the hole in the roof or the hole in the ceiling, there would be no coverage under the subject policy for the ensuing property personal business property damage loss."

Counsel for Truck Insurance made a formal "motion to dismiss based upon improper facts," which the trial court immediately granted. The judge then offered this explanation: "The only testimony before the court with

respect to the structure of the roof is plaintiff's observation. [¶] The court feels comfortable concluding as a matter of law that in light of the Doheny West case [*Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co.* (1997) 60 Cal.App.4th 400 [70 Cal.Rptr.2d 260]] that observation does not and cannot establish the sort of structural defect that would be consistent with the concept of imminent collapse. [¶] And I believe that's the burden under the Doheny case that plaintiff needs to meet to show that in order to collect under the policy that the roof—she needed to establish that the roof was in danger of imminent collapse not actual collapse. It's either actual or imminent in California as I understand it, and the offer of proof fails to meet that burden."

Counsel for Truck Insurance then suggested that the procedure the court had just followed "be appropriately termed a motion for judgment or a motion for non-suit or directed verdict alternatively." The trial judge quickly corrected him. "It's not directed verdict," and counsel for Truck Insurance summed it up as a "motion for judgment or motion for non-suit." Counsel for Travis said "I'll waive any objection to the label of a judgment." The court added, "I said motion to dismiss," and the final substantive word on the characterization came from Travis's counsel (apparently alluding to *Stein-Brief Group, Inc. v. Home Indemnity Co., supra,* 65 Cal.App.4th 364) "the appellate court said it was akin to motion for judgment on the opening statement and that's close enough." The Panicos and Travis together filed one notice of appeal, designating both the judgment regarding the Panicos and the judgment regarding Travis.

### B

*Doheny West* is indeed the fountainhead California case for an exposition of what "collapse" means in the context of an insurance policy. (The insurance contract in *Doheny West* was identical in relevant part to the one before us now). The case arose because a structural engineer came to the conclusion that a parking structure for a West Hollywood condominium building with a swimming pool, hot tub and pool room on top was so structurally unsound that the swimming pool was in *danger* of collapse in the next earthquake. (See *Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co., supra,* 60 Cal.App.4th at pp. 402-403.) The homeowners association made the appropriate repairs, billed the insurance company, which then turned their claim down, and the appellate court was eventually confronted with the question of whether the word "collapse" could include "mere impairment of structural integrity" as well as "actual collapse." (See *id.* at pp. 405-406.) The answer was no, though the court added that "imminent" collapse would qualify. (*Id.* at pp. 406, 408.) And as

to whether the homeowners had a claim for imminent collapse, the appellate court ruled that they didn't. After a proper trial in which both sides submitted conflicting evidence on the degree of damage sustained by the building, the trial court had believed the insurer's experts and found that collapse was indeed not imminent. (See *id.* at pp. 409-410.) The conflict in the evidence was of course resolved in favor of the judgment, which was accordingly affirmed.

■ *Doheny West*, however, can take a court only so far in the context of an insurance claim like the one before us, where the issue is not whether collapse is threatened, but whether there has been any actual collapse at all, or at least, as Travis reminds us, whether there has been any actual collapse of "any part" of the building, including the roof or ceiling.

Well, did at least a part of Travis's building actually collapse? Or did it just leak? This is where the standard of review and the procedures used by the trial court require reversal. We cannot save the judgment by saying this case was the equivalent of a court trial on stipulated facts, or even a nonsuit motion made after the close of evidence in a court trial (see Code Civ. Proc., § 631.8) and thereby read all inferences in favor of the judgment.[1] The dialogue in the record is inescapable that both parties and the trial judge understood the procedure to be the functional equivalent of a motion for nonsuit in a jury trial based on plaintiff's opening statement. And that subjects any ensuing judgment to an extremely strict standard of review: Not only must all reasonable inferences be drawn in favor of the nonmoving party, but that party must be given the opportunity to amend the opening statement so as to correct its supposed defects. (See *John Norton Farms, Inc. v. Todagco* (1981) 124 Cal.App.3d 149, 161 [177 Cal.Rptr. 215] ["since the motion for nonsuit is designed to call attention to correctable defects, granting such a motion after the plaintiff's opening statement can be upheld only where it is clear that counsel has stated all the facts"].)

[1]In *Lokeijak*, a trial court policy memorandum suggested that a "mini-trial" conducted on "stipulated facts, declarations, or live testimony—perhaps even before a jury" was a useful alternative to a formal summary judgment motion. (See *Lokeijak v. City of Irvine, supra,* 65 Cal.App.4th at p. 343, fn. 2.) Of course, in cases of a "mini-trial" in front of a jury there is no problem: There has clearly been a resolution of the facts by a trier of fact. But there is a risk in other such procedures, particularly adjudication after counsel provides competing offers of proof—namely that the Court of Appeal would be bound to construe the procedure as the functional equivalent of either a motion for nonsuit or summary judgment, and apply a standard of review where the inferences would be drawn *against* the judgment. The net result is that time is not saved: Judgments that might otherwise be routinely affirmed must be reversed because of some inference that could be drawn from the losing party's facts. The solution for harried trial judges who, we recognize, are under pressure to move tremendous case loads along expeditiously, is for the record to clearly show that the parties have actually agreed to have a *trial*—even if only on stipulated facts, declarations, or offers of proof— before the judge.

According to the opening statement, a trier of fact could have found that as many as six 2-by-2 ceiling tiles had fallen. There was also a hole in the roof above, of indeterminate size: The record here, with its allusion to Patty Panico's thumb and forefinger, is not at all clear as to the hole's actual size, and, more importantly, its size in comparison to the roof as a whole.

One tile of many, dislodged from a roof and leaving a relatively small opening in it, does not a "collapse" make. On the other hand, when a substantial part of any structure falls under the weight of water, surely the ordinary person would think there has been a collapse. We don't know the exact size of the "hole" in the roof, but *on this record* it is reasonable to infer—particularly from the fact that it may have let in enough water to cause up to six ceiling tiles to fall—that it was substantial enough.

Additionally, ceiling tiles are certainly "part" of a building, even if only an interior part (a ceiling beneath a roof). All one has to do is look up at a ceiling in a room (particularly a small room or office) with 2-by-2 tiles and imagine what it would be like if six of them were missing to realize that if six of them were to—shall we say "fall down"—that the event could be reasonably characterized as a "collapse."

The trial court appears to have been misled by the absence of any offer of proof of "structural defect that would be consistent with the concept of imminent collapse." But *Doheny West* should not be read to require that element in all cases. The need for a "structural defect" only governs cases where there has been no actual collapse at all, and the question is the imminency of any collapse. It doesn't control cases where something has fallen in, yet there remains a dispute over whether the "falling in" was big enough to rate the appellation "collapse." The trial court thus erred in granting the motion for nonsuit.

## II

We are required to dismiss the appeal from the judgment dismissing the Panicos' individual claims. There was separate judgment of dismissal filed March 24, 1998, and notice of entry of that judgment was served April 2, 1998. Because the judgment disposed of all causes of actions in which the Panicos were plaintiffs, it was separately appealable. (See *Justus v. Atchison* (1977) 19 Cal.3d 564, 568 [139 Cal.Rptr. 97, 565 P.2d 122] [judgments

against plaintiff husbands were immediately appealable even though remaining plaintiff wives joined in same causes of action as plaintiff husbands].)[2] The combined notice of appeal that included the appeal from the March 24, 1998 judgment wasn't filed, however, until October 30, 1998. While the notice of appeal was timely as to the judgment concerning Travis's claims (notice of entry was not served on that one until September 3, 1998), the notice of appeal as to the earlier judgment was most certainly untimely.

## III

The judgment concerning the claims of Travis is reversed. The appeal concerning the claims of Ronald and Patty Panico is dismissed. In the interests of justice the parties will bear their own costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.

---

[2]*Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 171 [216 Cal.Rptr. 661, 703 P.2d 1], would later disapprove certain language on an entirely different point in *Justus.*