Filed 7/3/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| TUSTIN FIELD GAS & FOOD, INC., | B268850 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC555247) |
| v. | |
| MID-CENTURY INSURANCE COMPANY, | |
| Defendant and Respondent. | |

 APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael M. Johnson, Judge.  Affirmed.

 Murray M. Sinclair & Associates and Murray M. Sinclair for Plaintiff and Appellant.

 Tharpe & Howell, Timothy D. Lake and Eric B. Kunkel, for Defendant and Respondent.


\* \* \* \* \* \*

This case involves a question of insurance coverage: When has a building or part of a building "collapsed" if that term is left undefined in an insurance policy? The gas station owner in this case demanded that its insurance company pay up when the fiberglass sheath of one of its underground gasoline storage tanks split after resting on a rock for 16 years. On cross-motions for summary judgment and/or adjudication, the trial court ruled that this was not a collapse as a matter of law. We agree, and affirm.

## FACTS AND PROCEDURAL BACKGROUND

I. **Facts**

A. ***The underground storage tanks***

Tustin Field Gas & Food, Inc. (plaintiff) owns a gas station and minimart in Palm Springs, California. The station stores the gas dispensed by its pumps in two underground 15,000-gallon tanks. The tanks are located approximately 30 feet from the minimart, and are buried beneath a six or seven inch concrete slab and five or six feet of dirt. The tanks themselves are cylinders approximately 30 feet long and nine feet in diameter, and are double-walled: They have an inner wall made of steel, wrapped in a synthetic honeycomb, and then sheathed with an outer wall made of "fragile" fiberglass. The tanks are connected to the pumps through pipes carrying the fuel and are connected to the minimart with electrical conduit.

When these tanks were originally placed underground in 1997, the installer did not follow the tank manufacturer's instructions to bury them in pea gravel or crushed rock. Instead, the installer just dug a hole, placed the tanks into that hole, and then covered them with "native soil" containing rocks, boulders, chunks of asphalt, rusted pipes, and other debris. The first tank, referred to as Underground Storage Tank-1 or "UST-1," was set

atop a boulder with a nine-inch diameter as well as atop pockets of air.

**B.      *Discovery of damage to UST-1's fiberglass sheath***

In September 2013, plaintiff conducted its annual test of UST-1's integrity and learned that its fiberglass sheath was no longer intact.  (Health & Saf. Code, § 25284.2 [requiring annual testing of underground tanks].)  This was the first time either tank had failed a test in the 16 years since the tanks were installed.  The tanks were excavated.  The fiberglass sheath on the underside of UST-1 had a long, narrow crack that partially touched the nine-inch boulder, which had itself cracked in two.  UST-1's inner steel wall was still intact, and UST-1's outer fiberglass sheath had not lost its cylindrical shape.  There was no "imminent danger" that UST-1's inner steel wall would be crushed inward.  Plaintiff paid to have UST-1's fiberglass sheath patched.

**C.      *Claim against insurance policy***

At the time of the testing, plaintiff had an insurance policy (the Policy) covering property damage with defendant Mid-Century Insurance Company (defendant).  Plaintiff presented a claim for the cost of excavating and repairing UST-1.

The Coverage section of the Policy (Section A) provides that defendant "will pay for direct physical loss of or damage to Covered Property at the premises . . . caused by or resulting from any Covered Cause of Loss."

As pertinent here, Section A.1. of the Policy defines Covered Property to include "[b]uildings, meaning the buildings and structures at the premises . . ., including . . . (2) Fixtures, including outdoor fixtures; [and] (3) Permanently installed: (a) Machinery; and (b) Equipment."

3

Also as pertinent here, Section A.3. of the Policy defines "Covered Causes of Loss" as "Risks Of Direct Physical Loss unless the loss is . . . Excluded in Section B., Exclusions . . ."  In its Exclusions section (Section B), the Policy provides that defendant "will not pay for loss or damage caused directly or indirectly by any of the following. . . . regardless of any other cause or event that contributes concurrently or in any sequence to the loss," and goes on to specify, in pertinent part, "Collapse, except as provided in the Additional Coverage for Collapse" (Section B.2.i.).

The Collapse subsection of the Additional Coverages section (Section A.5.d. of the Policy) provides that defendant "will pay for direct physical loss or damage to Covered Property, caused by a collapse of a building or any part of a building insured under this policy, if the collapse is caused by one or more of the following:  . . . (b) Hidden decay; . . . (d) Weight of people or personal property; . . .  (f) Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation. However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by [an enumerated] cause of loss . . ., [defendant] will pay for the loss or damage even if use of defective material or methods in construction, remodeling or renovation, contributes to the collapse."  This subsection also specifies that "Collapse does not include settling, cracking, shrinkage, bulging or expansion."  (Accord, Section B.2.k.(4) [excluding from Covered Causes of Loss "[s]ettling, cracking, shrinking or expansion"].)

In a letter, defendant denied plaintiff's demand for coverage on two grounds:  (1) the damage to UST-1 did not

4

qualify as "damage to a building or any part of a building"; and (2) "it does not appear that the efficient proximate cause [of that damage] is Collapse."

## II.     Procedural Background

Plaintiff sued defendant for (1) breach of contract, (2) bad faith denial of insurance coverage, in violation of the implied covenant of good faith and fair dealing, and (3) declaratory relief pronouncing defendant's "duty to indemnify Plaintiff up to the limit of liability."

Plaintiff then moved for summary adjudication of its declaratory relief action, and defendant moved for summary judgment. The trial court viewed the motions as "essentially cross-motions."

In a 10-page order, the trial court granted summary judgment for defendant and denied summary adjudication for plaintiff. The court concluded that UST-1 constituted Covered Property under the Policy, reasoning that (1) defendant "appear[ed] to have conceded" that point, and (2) UST-1 otherwise qualified as "permanently installed equipment" and as a "fixture," both of which satisfied the Policy's definition of "building" and hence of Covered Property.

The court nevertheless concluded that there was no Covered Cause of Loss because there had been no "collapse." Specifically, the court ruled that plaintiff had to show an "actual" collapse of UST-1. The court noted that the Policy did not define the term collapse. *Doheny West Homeowners' Assn. v. American Guarantee & Liability Ins. Co.* (1997) 60 Cal.App.4th 400, 401, 406 (*Doheny West*), the court observed, had construed an insurance policy that did not define collapse but provided coverage for "loss or damage caused by or resulting *from risks of*

5

direct physical loss *involving* collapse of a building or any part of a building" as providing coverage for both actual and imminent collapse. However, the court found the Policy to be "not as broad" as the policy in *Doheny West* because it "does not include the broader phrases 'risk of loss' and 'involving collapse.'" The court went on to conclude that there was no evidence of an actual collapse of UST-1 because "plaintiff ha[d] failed to submit evidence that UST-1 suffered a complete change in structure and lost its distinctive character as an [underground storage tank.]" Plaintiff had shown, at most, that UST-1 was no longer usable under pertinent laws because its outer sheath had been breached, but the court ruled that a mere "impairment of [UST-1's] structural integrity" did not constitute an "actual collapse."

Because plaintiff was not entitled to benefits under the Policy, the court concluded that all three of plaintiff's claims failed as a matter of law.

After the trial court issued its formal order granting summary judgment and entered judgment, plaintiff timely filed a notice of appeal.

## DISCUSSION

Plaintiff argues that the trial court erred in granting summary judgment to defendant. We review such grants de novo. (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)

### I. General Principles

Summary judgment is appropriate when the moving party demonstrates "[it] is entitled to a judgment as a matter of law" because, among other things, the nonmoving party (here, plaintiff) cannot establish "[o]ne or more of the elements of [its] cause of action." (Code Civ. Proc., § 437c, subds. (c), (*o*)(1)

6

& (p)(2).)  Here, all three of plaintiff's claims—for breach of contract, bad faith denial of insurance, and declaratory relief—rest on the common element that plaintiff show it is entitled to coverage under the Policy.  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821 ["breach" is an element of a breach of contract action]; *Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 408 ["without coverage there can be no liability for bad faith on the part of the insurer"]; *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 287 (*Hartford*) [duty to indemnify turns on whether claim is actually covered by policy].)

Whether plaintiff is entitled to coverage under the Policy turns initially on two questions:  (1) What does the Policy mean by the term collapse?; and (2) Has plaintiff raised a triable issue of fact as to whether the damage to UST-1 was caused by a collapse, once that term is defined?

The first question requires us to interpret the Policy. Insurance contracts have "special features," but "are still contracts to which the ordinary rules of contractual interpretation apply."  (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.)  Those rules direct us to ascertain "'the mutual intention of the parties at the time the contract is formed.'"  (*Hartford*, *supra*, 59 Cal.4th at p. 288, quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 821-822.)  We look first to the Policy's language, and interpret that language "'in [its] "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage."'"  (*Hartford*, at p. 288, quoting *AIU*, at p. 822.)  We must also "interpret the language in context."  (*Bank of the West*, at p. 1265.)  This approach is designed to produce an

7

interpretation that aligns with "'the objectively reasonable expectations of the insured'" (*ibid.*), which in turn harmonizes the policies of enforcing the parties' contract (*Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1080 (*Rosen*)) and resolving ambiguities in the policy in favor of the insured (*AIU*, at p. 822).

The second question requires us to ascertain whether "the evidence [produced in the summary judgment proceeding] would allow a reasonable trier of fact to find the underlying fact [of collapse, once properly defined] in favor of" plaintiff under "the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

## II. Analysis

As pertinent here, plaintiff's entitlement to coverage under the Policy turns on whether plaintiff can show that (1) UST-1 suffered "direct physical loss or damage . . . caused by collapse"; and (2) that collapse was "caused by" (a) "[h]idden decay," (b) the "[w]eight of people or personal property," or (c) the "[u]se of defective material or methods in construction" "if the collapse occurs after construction" and was "caused in part" by either (a) or (b). This is plaintiff's burden because Section A.3. of the Policy excludes any collapse from coverage, but Section A.5.d. countermands that exclusion to the extent of the exception outlined above. Consequently, the threshold question is what the Policy means by the term collapse.

The definition of collapse in insurance policies varies. When a policy defines the term, that definition controls. (See *Rosen, supra*, 30 Cal.4th at p. 1073 [policy defines collapse as "actually fallen down or fallen to pieces"]; *Grebow v. Mercury Ins. Co.* (2015) 241 Cal.App.4th 564, 570 (*Grebow*) [policy defines

8

collapse as "sudden and complete breaking down or falling in or crumbling into pieces"].)  When a policy leaves the term collapse undefined, its meaning is derived from the context in which it is used in the policy.  When a policy's language reaches "the *entire* collapse of a . . . building structure," the policy covers "an actual, [but] not an imminent collapse." (*Jordan v. Allstate Ins. Co.* (2004) 116 Cal.App.4th 1206, 1210, 1221 (*Jordan*).)  When a policy's language reaches "loss or damage caused by or resulting from *risks* of direct physical loss *involving* collapse of a building," the policy is "broad enough to embrace the *threat* of loss from an imminent collapse" and thus covers both (1) actual collapse, and (2) imminent collapse, which means a collapse is "likely to occur at any moment, impending." (*Jordan*, at p. 1222; *Doheny West*, *supra*, 60 Cal.App.4th at pp. 401, 406; *Panico v. Truck Ins. Exchange* (2001) 90 Cal.App.4th 1294, 1299-1300 (*Panico*) [same]; *Stamm Theatres, Inc. v. Hartford Casualty Ins. Co.* (2001) 93 Cal.App.4th 531, 534-535, 542 (*Stamm Theatres*).)  When a policy excludes from coverage "settling," "cracking," "shrinkage," or "expansion," the policy will not cover a collapse—whether actual or imminent—based solely on a "substantial impairment of structural integrity"; to do otherwise would negate the exclusionary clause for settling and the like. (*Doheny West*, at pp. 405-406; *Stamm Theatres*, at pp. 541-542 ["*mere* settling, cracking, shrinkage, bulging or expansion is not enough"].)

Under these interpretive guideposts, the trial court correctly concluded that plaintiff has not raised a triable issue of fact regarding coverage.  Several key facts are undisputed.  It is undisputed that the construction company that placed UST-1 in the ground did so negligently because it placed UST-1 on a big rock and next to several air pockets, and then buried it with

9

debris-filled "native soil." It is undisputed that, 16 years later, UST-1's fiberglass sheath and the big rock both split. And it is undisputed that UST-1's inner steel wall remains intact and that UST-1's fiberglass sheath retained its cylindrical shape, but that UST-1 was not usable until its fiberglass sheath was patched.

These undisputed facts show that the damage to UST-1 constitutes at most a "substantial impairment of [its] structural integrity." However, because the Policy excludes "settling" and the like, a "substantial impairment of structural integrity" is not a "collapse" as a matter of law. (See *Doheny West*, *supra*, 60 Cal.App.4th at pp. 405-406; *Stamm Theatres*, *supra*, 93 Cal.App.4th at pp. 541-542.)

## III. Plaintiff's Arguments

Plaintiff resists our analysis with four categories of arguments.

### A. *The definition of collapse, generally*

Plaintiff urges us to construe the term collapse broadly, and offers up three arguments in support of such a construction.

First, plaintiff asserts that a building has collapsed if any part of it is "materially impaired so that [that part] cannot perform its structural function as part of the building." Because state law requires a gasoline storage tank to have an intact fiberglass sheath (Health & Saf. Code, § 25291), plaintiff reasons, UST-1 collapsed. In support of this definition, plaintiff cites *Sabella v. Wisler* (1963) 59 Cal.2d 21 (*Sabella*), *Grebow*, *supra*, 241 Cal.App.4th 564, and several treatises.

This argument lacks merit because none of the authorities plaintiff cites support its argument. *Sabella* confronted whether a policy that excluded coverage for loss by "cracking[] [and] shrinkage . . . unless loss by . . . collapse of buildings ensues"

10

provided coverage when a house built on improperly compacted fill dirt "sank in many places." (*Sabella*, *supra*, 59 Cal.2d at p. 26.) The court held that the loss was not covered because the policy "excluded with sufficient clarity all loss by settling . . . unless collapse of the dwelling ensued, and *since the house remained usable and continued to be occupied, it cannot be said that any 'collapse' occurred.*" (*Id.* at p. 31, italics added.) At most, this language in *Sabella* means that if a structure is useable, it has not collapsed. However, plaintiff's argument rests on the *converse* proposition—namely, that if a structure is *not* usable, it *has* collapsed. We know from *Doheny West* and *Stamm Theatres* that the law does not support this converse proposition, and *Doheny West* specifically explained how its construction is consistent with *Sabella*. (*Doheny West*, *supra*, 60 Cal.App.4th at pp. 405-406, 408; *Stamm Theatres*, *supra*, 93 Cal.App.4th at pp. 541-542.)

Grebow discusses the "split of authorities over the scope of collapse coverage when the policies leave the term 'collapse' undefined," and goes on to detail the "'modern'" or "'majority' view" holding that "collapse" encompasses "'damage [that] materially impairs the basic structure or substantial integrity of the building.'" (*Grebow*, *supra*, 241 Cal.App.4th at pp. 572-573.) This passage does not create a new "default" definition of the term collapse because it is dicta (given that the policy at issue in *Grebow did* define the term collapse) and because the split *Grebow* discusses involves a split among courts outside of California (given that *Grebow* cites secondary sources that cite only non-California cases).

For much the same reasons, the treatises plaintiff cites are beside the point because two of them (from Couch on Insurance

11

and American Jurisprudence) examine only out-of-state law, and the third (from the California Insurance Law Dictionary and Desk Reference) relies on the out-of-state law set forth in Couch on Insurance for its view that collapse reaches a "material[] impair[ment] [of] the[] function" of a building or its being "render[ed] . . . unfit for habitation."  That other states may define collapse more broadly is of little persuasive force.  (See *Episcopal Church Cases* (2009) 45 Cal.4th 467, 490 ["out-of-state decisions are not binding"].)

Second, plaintiff asserts that California law defines collapse as any "substantial impairment of structural integrity" of a building.  This is incorrect.  As described above, California law specifically holds to the contrary, at least where, as here, a policy excludes from collapse "settling" and the like.  (*Doheny West, supra*, 60 Cal.App.4th at pp. 405-406; *Stamm Theatres, supra*, 93 Cal.App.4th at pp. 541-542.)

Third, plaintiff makes a few policy-based arguments in support of a broader definition of collapse.  It contends that the absence of a definition for collapse in the Policy creates an ambiguity that must, under general principles of insurance law, be construed in its favor.  To be sure, when an insurance policy is ambiguous—that is, when "'it is capable of two or more constructions both of which are *reasonable*' [citation]" (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867)—that ambiguity is "generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage" (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37).  But "[t]he fact that a term is not defined in the polic[y] does not make it ambiguous."

12

(*County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406, 415.)  What is more, the decisional law at the time of the Policy's creation spelled out that a policy covering "collapse" but excluding "settling" and the like would be interpreted to require more than a showing of "substantial impairment of structural integrity" or a showing of "settling, cracking, shrinkage, bulging or expansion."  (*Doheny West*, *supra*, 60 Cal.App.4th at pp. 405-406; *Stamm Theatres*, *supra*, 93 Cal.App.4th at pp. 541-542.)  Thus, the Policy is not ambiguous on this point.  And even if it were, we are not at liberty to construe the ambiguity in the insured's favor at all cost, particularly when that construction would be in derogation of binding case law providing default rules for interpreting that ambiguity.  (*American Internat. Underwriters Ins. Co. v. American Guarantee & Liability Ins. Co.* (2010) 181 Cal.App.4th 616, 629 ["""""strict construction [in favor of the insured] does not mean strained construction"""""].)

Plaintiff further asserts that public policy favors a broader definition of collapse.  If collapse is interpreted narrowly to require a more complete collapse of an underground storage tank, plaintiff reasons, insured parties like plaintiff would have little incentive to repair lesser damage to their tanks, which could result in interim damage to the environment.  Putting aside for the moment that this argument overlooks the fact that state environmental authorities would likely step in to prevent this interim environmental damage (as they did here), our Supreme Court rejected a nearly identical argument in *Rosen*.  There, the plaintiff argued that a policy defining the term "collapse" as "actually fallen down or fallen to pieces" should reach imminent collapse short of actual collapse because public policy favors

13

repair of buildings *before* they actually collapse rather than afterwards. (*Rosen, supra*, 30 Cal.4th at p. 1077.) Our Supreme Court was unpersuaded, reasoning that a public-policy-based rewrite "would compel the insurer to give more than it promised and would allow the insured to get more than it paid for, thereby denying their freedom to contract as they please." (*Id.* at p. 1080.) *Rosen*'s reasoning applies with equal force here.

### B. The definition of collapse in the policy

Plaintiff argues that the Policy is akin to the policies with a broader definition of collapse discussed in *Doheny West*, *Panico*, and *Stamm Theatres* because the Policy's definition of Covered Causes of Loss refers to "*Risks* Of Direct Physical Loss." Because the Policy uses the word "risk," plaintiff reasons, the Policy reaches imminent collapse as well as actual collapse. This argument is both incorrect and, ultimately, beside the point. It is incorrect because the Policy *excludes* collapse from its definition of Covered Causes of Loss, and then creates a more limited "exception to the exception" that re-extends coverage for collapse-related damage, but only "for direct physical loss or damage to Covered Property, caused by a collapse of a building or any part of a building insured under this policy, if the collapse is caused by one or more" enumerated reasons. Because this revival of coverage for collapse does not include "risks of" collapse (just collapse itself) *and* because the Policy nowhere covers damage "*involving* collapse," the broader definition of collapse discussed in *Doheny West*, *Panico*, and *Stamm Theatres* is inapplicable. (Cf. *Doheny West, supra*, 60 Cal.App.4th at p. 405 ["with the phrases 'risk of loss,' and 'involving collapse,' the policy broadens coverage beyond actual collapse"].) Plaintiff's argument in this regard is also beside the point because even this broader

14

definition of collapse does not reach a "substantial impairment of structural integrity" or "settling" and the like, at least when the policy also excludes "settling" and the like. (*Id*. at pp. 405-406.)

### C. Expert testimony and estoppel

Plaintiff suggests that we must interpret the term collapse in the Policy in light of the expert testimony it proffered indicating that UST-1 "collapsed" and in light of defendant's concession that UST-1 "collapsed." Plaintiff is wrong. Although plaintiff's expert repeatedly characterized the damage to UST-1's fiberglass sheath as a "collapse," and plaintiff's owner parroted that characterization when relaying what that expert told him, the trial court sustained defendant's objections to this evidence, and plaintiff does not attack those evidentiary rulings on appeal. (*Frittelli, Inc. v. 350 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41 [failure to challenge trial court's evidentiary rulings on summary judgment obligates appellate court to honor those rulings].) Even if we overlooked plaintiff's forfeiture, "[e]xpert testimony is not generally admissible on the question of the meaning of particular policy language" because "it is the *court's* function to interpret policy language." (*Jordan, supra*, 116 Cal.App.4th at pp. 1217-1218, italics added.)

Nor did defendant concede the issue of collapse. Although defendant in its opposition to plaintiff's motion for summary adjudication stated, in one sentence, that "[t]he damaged tank, UST-1, along with its fiberglass jacket collapsed down onto the rock due to the improper installation of the tank," this sentence is not, as plaintiff urges, a concession to the meaning of the term collapse in the Policy that defendant is now judicially estopped from denying. In the very same filing, defendant argued at length that the damage to UST-1 was not a collapse within the

meaning of the Policy.  At best, the sentence at issue used the term collapse in its colloquial sense to describe what happened; at worst, the sentence is a misstatement.  In neither case does it constitute judicial estoppel.  (*Aguilar v. Lerner* (2004) 32 Cal.4th 974, 986-987 [judicial estoppel only applies if the party has taken two "'totally inconsistent'" positions and not "'as a result of ignorance, fraud, or mistake'"]; *Miller v. Bank of America, N.A.* (2013) 213 Cal.App.4th 1, 10 ["misstatements" of counsel do not warrant application of judicial estoppel doctrine].)

### D.    *Triable issue on causation*

Plaintiff suggests that, even as we interpret the term collapse, there is a triable issue of fact warranting denial of summary judgment because there is a factual dispute over whether UST-1 pressed down onto the rock, or whether the rock pushed up into UST-1's fiberglass sheath.  However, this dispute is not "material" because no matter how it is resolved, the damage to UST-1 is the same and amounts at most to a "substantial impairment of [its] structural integrity."[1]

---

[1]    In light of our conclusion, we have no occasion to examine whether UST-1 qualifies as a "building" under the policy or whether the "collapse" was caused by one of the several causes set forth in the policy.

16

## DISPOSITION

The judgment is affirmed.  Defendant is entitled to its costs on appeal.

**CERTIFIED FOR PUBLICATION.**

_____, J.

HOFFSTADT

We concur:

_____, Acting P. J.

ASHMANN-GERST

_____, J.

CHAVEZ