Filed 9/3/21  P. v. Thompson CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B308172 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. A399617) |
| v. | |
| WALTER THOMPSON, JR., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Michael Garcia, Judge.  Reversed.

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Walter Thompson, Jr. (defendant), appeals from the denial of his petition to vacate his 1984 felony murder conviction and to resentence him pursuant to Penal Code section 1170.95.[1] He contends that vacatur and resentencing is required under principles of double jeopardy due to the reduction of the murder conviction to second degree murder at the time of the original sentencing in 1985, and substantial evidence does not support a finding that he acted with reckless indifference to human life. We reject defendant's double jeopardy claim but conclude that the trial court erred by failing to make an independent finding that defendant could still be convicted of murder under current law. We thus reverse and remand with directions.

## BACKGROUND

**The charges**

In 1984, defendant and codefendant Oscar Harrison were charged with murder, robbery, and burglary. ~(CT 4-6)~ Midtrial Harrison pled guilty to second degree murder. Defendant was convicted by a jury of first degree murder, which the trial court reduced to second degree murder. ~(CT 7, 23-24; B012630 2 RT 498)~ Defendant was sentenced to a term of 15 years to life in prison, and the judgment was affirmed on appeal in *People v. Thompson* (Nov. 21, 1985, B012630) (nonpub. opn.).~(CT 25; 233-234)~

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

**Prosecution evidence presented at trial**

On the morning of September 12, 1983, Larry Smith, the manager of an apartment building in Hollywood, discovered the body of Martin Eisinger in Eisinger's first floor studio apartment. ~(B012630 - 1 RT 70, 183-184, 187)~ Smith smelled a foul odor coming from the apartment and discovered a bent window screen partially hanging off. He then looked in the window and saw Eisinger's legs protruding from under a blanket, with papers, boxes, and other things strewn about the room. ~(B012630 - 1 RT 189-191)~ Smith did not know that Eisinger was dead. He called the police and was told to break in immediately. ~(B012630 - 1 RT 191)~ He then found Eisinger dead, lying face up with a large bath towel on his face covering his mouth (but not his nose) and tightly tied in the back of his neck with a single knot. ~(B012630 - 1 RT 191-193, 204, 216)~ The room was messy, but not much more than its usual state.[2] ~(B012630 - 1 RT  205)~ Smith did not recall seeing a bed sheet tied around the body. ~(B012630 - 1 RT 192)~ Eisinger's apartment had been previously burglarized several times but he refused to keep the windows locked. His windows were open the day Smith found his body. ~(B012630 - 1 RT  207)~

Detective Richard Swanston, one of the investigating officers, arrived on the scene that afternoon. ~(B012630 - 1 RT 68-69)~ Upon entering the apartment he saw Eisinger's body a few feet inside the front door, partially covered with a rust-colored blanket. ~(B012630 - 1 RT 70-71, 74)~ There was an orange towel on the floor beneath his head and neck, and his

---

[2]    Eisinger's apartment was usually so messy that the health department was involved and fines had been imposed twice in the past.~(B012630 - 1 RT  205-206)~

hands and arms were tied behind his back with a light blue fitted bed sheet. The sheet was tied to his right arm, knotted, went around his back to his left arm, and was wrapped around his left arm twice but not knotted. ~(B012630 - 1 RT 72)~ It appeared to Detective Swanston that the place had been ransacked, with drawers in the dresser opened and emptied, and the closet's contents were strewn about the floor. Eisinger had contusions on his forehead above the right eye, to both knees, elbows, arms, and hands. ~(B012630 - 1 RT 72)~ The bathroom window was open, and the screen was bent and pulled out. No broken glass was found.~(B012630 - 1 RT 73-74, 84)~

Deputy medical examiner Sharon Schnittker testified that Eisinger died of soft ligature strangulation ~(B012630 - 2 RT 274, 277)~ He also had injuries to the face consistent with blunt force trauma and a bruise on his buttock consistent with a knee having been placed there by someone who was strangling him from behind. ~(B012630 - 2 RT 281, 283)~ In her opinion, Eisinger died from a lack of oxygen due to having had the towel knotted around his neck and then tightened. ~(B012630 - 2 RT 292)~ Dr. Schnittker noted that Eisinger was 75 years old with a heart problem but found no indication that these factors had contributed to his death. She explained that it had not been documented that an older person would succumb faster to compression of the external airway than a younger person. ~(B012630 - 2 RT 297-297)~

Smith testified that he was acquainted with both defendant and codefendant Harrison,~(B012630 - 1 RT 198)~ who lived together at the Hollywood building. Harrison, who did maintenance work for the building,~(B012630 - 1 RT 199, 203)~ had installed all the window screens. ~(B012630 - 1 RT 204)~

4

Smith knew defendant only as Harrison's friend who would come to the apartment at times and drink beer. ~(B012630 - 1 RT 199)~ After Smith and Harrison had a disagreement not long before the murder, Harrison went to live with Beverly Harris (Harris). ~(B012630 - 1 RT 199, 209)~ Smith and Harrison made up two weeks after the murder, and Harrison moved back in and lived there until he was arrested at Smith's apartment on February 11, 1984.~(B012630 - 1 RT 77, 213)~

Bernadette (or Rosalie) Miera testified that she lived in the Hollywood apartment building and knew Smith and Harrison. ~(B012630 - 1 RT 92)~ Miera admitted that on February 7, 1984, while she was in custody, she spoke to a detective at the Hollywood station about the night of the murder, but she claimed that everything she told him was a lie. ~(B012630 - 1 RT 93-106, 122)~ She admitted telling the detective that she saw Harrison and another man walk to the side of the building where Eisinger's apartment was, and shortly after that she heard the sounds of breaking glass, of someone gagging, and then someone yelling, "What's happening, what's happening?" ~(B012630 - 1 RT 104-105)~ She did not recognize the voice, did not know defendant and would not have recognized his voice. ~(B012630 - 1 RT 105-106)~ Miera also told the detective that about four minutes after hearing the gagging sounds she saw Harrison and the other man walk away from the building. She heard Harrison say, "Let's get out of here, nigger," and she saw Harrison put something in his waistband.~(B012630 - 1 RT 106-107)~

Detective Jerry Stephens testified that he had interviewed Miera, and confirmed she told him she was sitting outside the night of the murder and saw Harrison about 25 feet from her with the other man, walking westbound in front of the building

down a walkway and out of view. ~(B012630 - 1 RT 161, 165)~ A few seconds later, she said she heard a commotion at the west side of the building and something that sounded like glass breaking. A couple minutes later she heard gagging sounds from the victim's apartment, like someone was gasping for air. About four minutes later, she saw Harrison and the other man walk out and run away eastbound.~(B012630 - 1 RT 165)~

Harris testified about conversations she heard between defendant and Harrison~(B012630 - 1 RT 227)~ sometime in August 1983. Harrison then spoke of the burglary of Eisinger's apartment that he and another person committed while Eisinger slept. They stole $3,000. ~(B012630 - 1 RT 230-232)~ Defendant suggested another burglary. ~(B012630 - 1 RT 234)~ Harris testified that defendant suggested that Harrison put a "sheet— towel" over the man's head so he would not be able to identify him. ~(B012630 - 1 RT 242)~ Then Harrison said that he was going to put the sheet over the man's face so that he would not recognize him.~(B012630 - 1 RT 246)~

~(B012630 - 1 RT 235, 239)~ A week later Harrison told Harris that after entering through a side window, he put a sheet over the man's head, put his knee in his chest, and beat him with his fist.[3] ~(B012630 - 1 RT 239-242)~ He then found $500 in $20 bills and a ring. Defendant said to Harrison, "I heard the man in there gagging. Did you kill him? Did you kill him[?]" Harrison said, "No, I did not kill him. I did not kill him." Defendant said, "Man, you had to kill him? You had to kill him, because I heard him gagging." Harrison replied, "No, I didn't kill him."

---

[3] Although sometimes Harris made it clear who said or did what, she also testified without objection that "they" said or did something.

Harris's sister, Azalia Harris, testified that she overheard the same conversation between defendant and Harrison.~(B012630 - 2 RT 368-371)~

Detective Swanston's summary of defendant's interview was attached as an exhibit to the prosecution's opposition to defendant's section 1170.95 petition. ~(CT 59)~ It contained a reference to defendant's admission that it was intended that he be the lookout. "That night we parked . . . [,] walked to the side of the apartment and [Harrison] took off the screen to the bathroom window. He opened up the bathroom window and climbed in. I waited outside. He was struggling with the old man. I heard him gagging. I stayed at the front porch steps and waited. Then I went inside through the same window. When I got inside I saw the old man laying [*sic*] on the floor with the gold blanket over him. I thought he was dead. [Harrison] took a ring off the floor and he got about $500.00 from the inside of the old man['’]s jacket in the closet. I looked around in the house too but I didn't take anything. We both climbed out the same window and ran down to the motorcycle."

**The section 1170.95 petition**

In 2019, defendant filed a petition pursuant to section 1170.95 to vacate his murder conviction. ~(CT 26-28)~ On the form petition, defendant checked the boxes for the allegations that he had been charged with murder, that he was not the actual killer, that he was convicted "pursuant to the felony murder rule or the natural and probable consequences doctrine," and that his murder conviction would be invalid under the "changes made to Penal Code §§ 188 and 189, effective January 1, 2019." ~(CT 27)~ Defendant checked the box requesting the appointment of counsel, as well as the box averring that there

7

has been a prior determination by a court or jury that he was not a major participant in the crime or did not act with reckless indifference to human life. ~(CT 27-28)~ The prosecution opposed the petition on the grounds that section 1170.95 was unconstitutional[4] and asserted that the record of conviction showed that defendant could still be convicted of murder based upon express or implied malice. ~(CT 33)~

The trial court appointed counsel, received briefing from the prosecution and defense counsel, found that defendant had made a prima facie showing of eligibility for relief, and scheduled a show-cause hearing on the merits of the petition. ~(CT 30, 237-241)~ At the hearing, the prosecutor submitted its case on the record of conviction without presenting new evidence, and the trial court heard the argument of counsel.~(RT 29)~

On September 17, 2020, the trial court denied relief upon finding that defendant was a major participant in the underlying felony and acted with reckless indifference to human life. ~(RT 48; CT 242, 245-246)~ The court based its reckless indifference finding on evidence that defendant was in close proximity to the scene, heard the victim struggling and gagging, and did not come to his assistance. The court issued a memorandum of decision explaining its reasoning in more detail and discussing factors set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). ~(RT 48; CT 259-268)~ The trial court rejected defense arguments because "the jury concluded there was enough evidence to support a first-degree murder conviction and [defendant] could still be convicted of

---

[4] The trial court rejected this contention and respondent does not renew it here. ~(CT 267)~

murder as a major participant who acted with reckless indifference . . . ."~(CT 267)~

Defendant filed a timely notice of appeal from the trial court's order.~(CT 243)~

## DISCUSSION

### I. Contentions and legal principles underlying section 1170.95

Defendant contends that the trial court erred in denying the petition, finding that the reduction of the murder conviction to second degree murder did not make him eligible for relief amounted to a violation of the constitutional prohibition against double jeopardy. ~(AOB 30-33; CT 246 (finding))~ Defendant also contends that substantial evidence does not support a finding that he acted with reckless indifference to human life.~(AOB 45)~

Section 1170.95 was added by Senate Bill No. 1437 (2017-2018 Reg. Sess.) to provide a procedure by which those convicted of murder can seek retroactive relief if the changes in sections 188 or 189 would affect their previously affirmed convictions. (*People v. Martinez* (2019) 31 Cal.App.5th 719, 722.) A person is entitled to relief under section 1170.95 if he was convicted of felony murder or murder under the natural and probable consequences theory but could not now "be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).)

"With one narrow exception [involving peace officer victims], Senate Bill 1437 effectively eliminates murder convictions premised on any theory of vicarious liability—that is, any theory by which a person can be convicted of murder for a killing committed by someone else (such as the felony-murder

9

theory or the natural and probable consequences theory)—unless the People also prove that the nonkiller defendant personally acted with the intent to kill or was a major participant who acted with reckless disregard to human life.  (§§ 188, 189, subds. (e), (f), 1170.95.)"  (*People v. Fortman* (2021) 64 Cal.App.5th 217, 222-223, fns. omitted, review granted July 21, 2021, S269228.)

The reckless indifference requirement was first articulated in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*) and *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*).  Collectively, the two decisions "place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions."  (*Banks, supra*, 61 Cal.4th at p. 794.)  In *Banks*, decided after defendant was convicted of felony murder, the California Supreme Court applied the analysis to felony-murder special circumstance requirements under section 190.2.  (*Banks*, at p. 794.)  As amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.), section 189, subdivision (e)(3), incorporates the same requirement into the felony-murder statute.  Thus, to convict a defendant who did not kill, the prosecution must prove that the defendant acted with reckless indifference to human life as a major participant in one of the enumerated serious felonies underlying felony murder.

The factors properly considered for determining reckless indifference were clarified in *Banks, supra*, 61 Cal.4th 788 and *Clark*, *supra*, 63 Cal.4th 522, where the California Supreme Court explained that a finding of reckless indifference to human life, "'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death."'"  (*Banks*, at p. 807.)  Meaning it must be proven beyond a

10

reasonable doubt that the defendant "*knew* his own actions would involve a grave risk of death." (*Ibid*.)[5]

In *Banks*, our high court explained that when analyzing whether a defendant displayed reckless disregard for human life it is important to consider where the defendant's conduct falls on the "'spectrum of culpability'" that *Enmund* and *Tison* established. (*In re Scoggins* (2020) 9 Cal.5th 667, 675, citing *Banks, supra*, 61 Cal.4th at p. 811.) "On one end of the spectrum is Enmund, 'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' (*Tison, supra*, 481 U.S. at p. 149.) At the other end is 'the felony murderer who actually killed, attempted to kill, or intended to kill.' (*Id*. at p. 150.)" (*Scoggins, supra*, at p. 675.)

When the defendant makes a prima facia showing of eligibility, and the trial court issues an order to show cause as it did here, "the court shall hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not been previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence." (§ 1170.95, subd. (d)(1).) The prosecution bears the burden to prove beyond a reasonable doubt

---

[5]     Reckless indifference to life is a "subjective awareness of a higher degree of risk than the 'conscious disregard for human life' required for conviction of second degree murder based on implied malice." (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1285.) "Conscious disregard for human life . . . 'requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less.'" (*Ibid*.)

that the defendant is ineligible for vacatur and resentencing. (§ 1170.95, subd. (d)(3).)  The parties may consult the record of conviction as the parties did here, or offer new or additional evidence, unless "there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the felony, [and in such a case] the court *shall* vacate the petitioner's conviction and resentence the petitioner."  (§ 1170.95, subd. (d)(2), italics added; accord, *People v. Ramirez* (2019) 41 Cal.App.5th 923, 930-933.)

## II.    Double Jeopardy

Defendant contends that the trial court could not properly find that he could still be convicted of first degree murder, reasoning that the reduction of his conviction to second degree murder was an implied acquittal of first degree murder, and because second degree felony murder no longer exists under the Senate Bill No. 1437 (2017-2018 Reg. Sess.) amendments, the constitutional prohibition against double jeopardy precluded a finding that defendant could still be convicted of first degree murder.~(AOB 30-36)~

Although Senate Bill No. 1437 (2017-2018 Reg. Sess.) eliminated second degree felony murder, "[a]n evidentiary hearing under section 1170.95 . . . does not implicate double jeopardy because section 1170.95 'involves a resentencing procedure, not a new prosecution.'  [Citation.]  The retroactive relief provided by section 1170.95 is a legislative 'act of lenity' intended to give defendants serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws and does not result in a new trial or increased punishment that could implicate the double jeopardy clause."  (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 111.)

12

## III. Standard of proof

Defendant contends that substantial evidence does not support the trial court's finding that he acted with reckless indifference to human life. ~(AOB 45)~ Reaching its conclusion that defendant acted with reckless indifference to human life, the trial court considered the *Banks* factors as well as conduct the court considered to be similar to the conduct in *Tison* and dissimilar to conduct in *Enmund*. ~(CT 259-268)~ However, it appears that the court applied the standard proof as stated in *People v. Duke* (2020) 55 Cal.App.5th 113, review granted January 13, 2021, S265309 (*Duke*). ~(RB 32-33, 36-37)~ *Duke* held that the standard "is essentially identical to the standard of substantial evidence, in which the reviewing court asks "'whether, on the entire record, a rational trier of fact *could* find the defendant guilty beyond a reasonable doubt . . . .'"" (*Id.* at p. 123, italics added [appellate substantial evidence standard], quoting *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Defendant agrees that *Duke* sets forth the correct standard of proof but contends that the prosecution failed to carry its burden to prove that he *could* still have been convicted of murder under the amended law. ~(AOB 30)~ We disagree that *Duke* states the correct standard of proof.

We have recently rejected the reasoning of *Duke* and have joined "the growing chorus" of appellate courts that require an independent finding by the trial court whether it *would* convict defendant on a still-viable theory, rather than whether a reasonable jury could convict defendant on a still-viable theory. (*Fortman, supra*, 64 Cal.App.5th at pp. 220-221, review granted, citing, e.g., *People v. Lopez* (2020) 56 Cal.App.5th 936, review granted Feb. 10, 2021, S265974; *People v. Rodriguez* (2020) 58

13

Cal.App.5th 227, review granted Mar. 10, 2021, S266652; *People v. Clements* (2021) 60 Cal.App.5th 597, review granted Apr. 28, 2021, S267624; *People v. Harris* (2021) 60 Cal.App.5th 939, review granted Apr. 28, 2021, S267802.)  We concluded that "section 1170.95, subdivision (d)(3) turns a petitioner's entitlement to relief on whether the trial court *itself* finds, beyond a reasonable doubt, that defendant is guilty of murder on a still-valid theory of liability." (*Fortman*, *supra*, at pp. 224-225, italics added.)

Here, although the trial court did not expressly state the standard it applied, it is clear that no independent finding that defendant *would* still be convicted under the amended law was made, as the court denied relief on the ground that "*the jury concluded* there was enough evidence to support a first-degree murder conviction and [defendant] *could* still be convicted of murder as a major participant who acted with reckless indifference . . . ." (Italics added.)  We thus remand the matter for a new evidentiary hearing pursuant to section 1170.95, subdivision (d), with application of the correct standard.[6]  (See *Fortman, supra*, 64 Cal.App.5th at pp. 226-227.)

## DISPOSITION

The order denying defendant's section 1170.95 petition to vacate his murder conviction and for resentencing is reversed. The matter is remanded to the superior court with directions to appoint counsel for defendant and to conduct a new evidentiary hearing pursuant to section 1170.95, subdivision (d), and to make an independent determination whether the prosecution has

---

[6]     We take no position on the outcome of such hearing.

14

proven beyond a reasonable doubt that defendant is guilty of murder on a still-valid theory of liability and thus ineligible for relief under the statute.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
ASHMANN-GERST, J.